**In re Elliott ABRAMS, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 91–BG–1518.**

District of Columbia Court of Appeals.

Reargued En Banc May 7, 1996.
Decided Feb. 5, 1997.

Charles J. Cooper, with whom William L. McGrath was on the brief, Washington, DC, for respondent.

Michael S. Frisch, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, and Julia L. Porter, Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before WAGNER, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, KING, RUIZ, and REID, Associate Judges.

ON REHEARING EN BANC

SCHWELB, Associate Judge.

This matter is before us on the recommendation of the Board on Professional Responsibility that Elliott Abrams, Esq., a member of our Bar, and formerly Assistant Secretary of State for Inter–American Affairs, be suspended from the practice of law in the District of Columbia for a period of one year. The Board concluded, on the basis of extensive evidentiary findings by the Hearing Committee, that Abrams had engaged in "dishonesty, deceit or misrepresentation" by giving false (but unsworn) testimony to three Congressional committees regarding the role of the United States government in what has become known as the Iran–Contra Affair.

Following Abrams' conviction, upon a plea of guilty, of criminal charges arising out of his Congressional testimony, President Bush granted him a full and unconditional pardon. Although Abrams conceded before the Board that the pardon did not preclude Bar Counsel

from maintaining this disciplinary proceeding, he now contends that the President's action blotted out not only his convictions but also the underlying conduct, and that Bar Counsel's charges must therefore be dismissed. A division of this court agreed with Abrams. *In re Abrams,* 662 A.2d 867 (D.C. 1995) (*Abrams I* ).

■ We granted Bar Counsel's petition for rehearing en banc, *In re Abrams,* 674 A.2d 499 (D.C.1996) (en banc) (*Abrams II* ), and we now hold, in conformity with the virtually unanimous weight of authority, that although the presidential pardon set aside Abrams' convictions, as well as the consequences which the law attaches to those convictions, it could not and did not require the court to close its eyes to the fact that Abrams did what he did. "Whatever the theory of the law may be as to the effect of a pardon, it cannot work such moral changes as to warrant the assertion that a pardoned convict is just as reliable as one who has constantly maintained the character of a good citizen." *State v. Hawkins,* 44 Ohio St. 98, 5 N.E. 228, 237 (1886). Specifically, the pardon "did not efface the . . . want of professional honesty involved in the crime." *People v. Gilmore,* 214 Ill. 569, 73 N.E. 737, 737 (1905).

■ "No moral character qualification for Bar membership is more important than truthfulness and candor." *In re Meyerson,* 190 Md. 671, 59 A.2d 489, 496 (1948). An attorney is required to be a person of good moral character not only at the time of admission to the Bar, but also thereafter. *In re Rouss,* 221 N.Y. 81, 116 N.E. 782, 783 (1917) (Cardozo, C.J.). The pardon could not "reinvest [Abrams] with those qualities which are absolutely essential for an attorney at law to possess or rehabilitate him in the trust and confidence of the court." *In re Lavine,* 2 Cal.2d 324, 41 P.2d 161, 163 (1935) (citation omitted). Accordingly, we hold that this court's authority to impose professional discipline was not nullified by the presidential pardon.

1. The facts are set forth in greater detail in Judge Terry's opinion for the court in *Abrams I,* 662

Abrams contends, in the alternative, that the discipline recommended by the Board is too severe. As reflected in Part IV of this opinion and in the separate concurring opinions of Judge Schwelb, Judge King, and Judge Ruiz, four members of the five-judge majority of the en banc court would suspend Abrams from practice for at least six months. Because this sanction has not commanded a majority of the full court, however, we order that Abrams be publicly censured.

## I.

### THE FACTS [1]

From 1981 to 1984, the United States openly provided military and other assistance to the Nicaraguan "Contras," who were attempting to overthrow the former Sandinista government of that Central American nation. In October 1984, Congress enacted the "Boland Amendment," Pub.L. No. 98–473, 98 Stat. 1837, 1935 (1984), which prohibited the furnishing of further assistance to the rebels. The Reagan administration, however, remained sympathetic to the Contra cause. As Assistant Secretary of State for Inter–American Affairs, Elliott Abrams was often the administration's spokesman on issues relating to United States policy in Central America.

On October 5, 1986, an American aircraft which was carrying supplies to the Contras was shot down over Nicaragua. The downing of the plane, and the capture of its pilot, led to public allegations that notwithstanding the Boland Amendment, the government was continuing to arm and otherwise assist the Contras. As a result, Abrams was called to appear before several Congressional committees to explain the government's position.

On October 10, 1986, Abrams testified as follows before the United States Senate Committee on Foreign Relations:

In the last two years, since Congress cut off support to the resistance, this supply system has kept them alive. It is not our supply system. It is one that grew up after we were forbidden from supplying

A.2d at 868–71.

the resistance, and *we have been kind of careful not to get closely involved with it and to stay away from it . . . .*

I think that people who are supplying the Contras believe that we generally approve of what they are doing—and they are right. We do generally approve of what they are doing, because they are keeping the Contras alive while Congress makes its decision, which each House has separately, though obviously final legislation is not yet ready.

So, the notion that we are generally in favor of people helping the Contras is correct.

*We do not encourage people to do this.* We don't round up people, we don't write letters, *we don't have conversations, we don't tell them to do this, we don't ask them to do it.* But I think it is quite clear, from the attitude of the administration, the attitude of the administration is that these people are doing a very good thing, and if they think they are doing something that we like, then, in a general sense, they are right. But *that is without any encouragement and coordination from us, other than a public speech by the President, that kind of thing, on the public record.*[2]

At the time Abrams so testified, he knew that Lieutenant Colonel Oliver North had engaged in conversations with people who were supplying the Contras, and that North had asked and encouraged these people to supply the Contras. Abrams concealed from the Senate Committee his knowledge of these conversations and of North's support for and coordination of the assistance being provided to the Contras.

Four days later, on October 14, 1986, Abrams gave the following testimony before the United States House of Representatives Permanent Select Committee on Intelligence:

[THE CHAIRMAN]: Do you know if any foreign government is helping to supply the Contras? There is a report in the L.A. paper, for example, that the Saudis are.

[MR. GEORGE]: [3] No sir, we have no intelligence of that.

[MR. ABRAMS]: I can only speak on that question for the last fifteen months when I have been in this job, and that story about the Saudis to my knowledge is false. I personally cannot tell you about pre–1985, but in 1985–1986, when I have been around, no.

[THE CHAIRMAN]: Is it also false with respect to other governments as well?

[MR. ABRAMS]: *Yes, it is also false.*

(Emphasis in information.) In fact, Abrams had personally met with a representative of the Sultan of Brunei to solicit the Sultan's assistance, and he was aware that the Sultan had agreed to provide ten million dollars to the Contras. Abrams had also provided the Sultan's representative with a Swiss bank account number so that funds for the Contras could be deposited into that account.

On November 25, 1986, Abrams testified before the United States Senate Select Committee on Intelligence. Earlier on that day, Attorney General Edwin C. Meese had disclosed at a press conference that the proceeds of sales of arms to Iran had been diverted to the Contras. Abrams stated that

I was, until today, fairly confident that there was no foreign government contributing to this. But I knew nothing, *still don't know anything, about the mechanisms by which money was transferred from private groups that have been raising it, to the Contras.*

(Emphasis added.) Once again, Abrams concealed his knowledge regarding the Brunei solicitation, and he misled the Senate Committee with respect to contributions that had been made to the Contras by private organizations and by a foreign government.[4]

---

2. We have italicized those portions of Abrams' testimony which were italicized in the criminal information which was subsequently filed against him.

3. Clair E. George, then the Deputy Director of Operations of the Central Intelligence Agency.

4. The Hearing Committee subsequently found that Abrams' statement that he knew nothing about the mechanisms for transferring money to the Contras was also false.

## II.

### THE DISCIPLINARY PROCEEDING

On October 7, 1991, Abrams entered a plea of guilty to a two-count information charging violations of 2 U.S.C. § 192 (1985) (willful failure to answer questions pertinent to a Congressional inquiry).[5] On November 15, 1991, Abrams was placed on probation for a term of two years and ordered to perform one hundred hours of community service.

Following Abrams' convictions, Bar Counsel charged him with three counts of "conduct involving dishonesty, deceit and misrepresentation," in violation of Disciplinary Rule 1–102(A)(4) of the former Code of Professional Responsibility. A hearing was held on December 21, 1992 before Hearing Committee No. 8, and the Committee took the case under advisement. On December 24, 1992, three days after that hearing, President Bush issued the full and unconditional pardon on which Abrams now relies.

On April 8, 1993, the Hearing Committee issued a comprehensive Report and Recommendation in which it found that Abrams had committed the charged violations. The Committee recommended that Abrams be suspended from practice for one year. The Committee took note of the presidential pardon, but concluded that "[i]n the context of attorney disciplinary proceedings, a presidential pardon will not preclude the imposition of sanctions."

Abrams excepted to the Hearing Committee's recommendation, but he did so solely on the ground that the proposed sanction was too harsh. In a *pro se* "Memorandum to the Board," Abrams explicitly acknowledged that the presidential pardon did not preclude Bar Counsel from pursuing disciplinary charges and that the Hearing Committee was correct in so concluding.

On July 26, 1993, the Board issued its Report and Recommendation. The Board sustained the Hearing Committee's findings and recommended, as had the Hearing Committee, that Abrams be suspended from practice for one year.[6] Apparently because Abrams had conceded the issue, the Board did not address at all the effect, if any, of the presidential pardon. Abrams filed timely exceptions to the Board's recommendation and, following the issuance of the division's opinion in *Abrams I* and the vacation of that opinion in *Abrams II*, the case was argued to the full court sitting en banc.

## III.

### THE EFFECT OF THE PARDON

*A. The Standard of Review.*

The question whether President Bush's pardon of Abrams requires dismissal of the disciplinary proceeding is one of law, and we consider it *de novo*. See *Griffin v. United States*, 618 A.2d 114, 117 (D.C.1992). We recognize, at the same time, that the Board on Professional Responsibility has "substantial expertise in the area of attorney discipline." *In re Ray*, 675 A.2d 1381, 1385 (D.C. 1996). The Board's views as to the issue before us, while not dispositive or presumptively dispositive, merit respectful consideration. Although, in the present case, Abrams' concession regarding the effect of the pardon obviated any occasion for the Board to address that issue, the Board has previously taken the position that a presidential pardon is not a defense in a disciplinary proceeding. *In re Felt*, Bar Docket No. 329–77 (BPR Nov. 12, 1981).

Abrams' acknowledgment before the Board that the pardon did not require dismissal of the proceeding also has other potential consequences. We have consistently held that an attorney who fails to present a point to the Board waives that point and "cannot be heard to raise it for the first time here." *Ray, supra*, 675 A.2d at 1386 (citing authorities). In this case, as we have seen, Abrams not only eschewed any contention

---

5. The two counts of the information were based respectively on Abrams' testimony of October 10 and 14, 1986. Abrams was not charged with a crime in connection with his testimony of November 25, 1986, apparently because he appeared before the Senate Committee on December 8, 1986 and corrected his prior misleading testimony about Brunei.

6. One member of the Board dissented in part and proposed a six-month suspension.

before the Board that the pardon was a defense, but affirmatively conceded that the pardon did not require dismissal. "The kind of barristerial about-face which characterizes this case finds little favor in the courts." *B.J.P. v. R.W.P.*, 637 A.2d 74, 78 (D.C.1994).

A pardon has been described as a "plea in bar," comparable to the statute of limitations. *Commonwealth v. Geagan*, 339 Mass. 487, 159 N.E.2d 870, 878, *cert. denied*, 361 U.S. 895, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). As Chief Justice Marshall explained for the Court in *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 8 L.Ed. 640 (1833),

> [t]he king's charter of pardon must be specially pleaded, *and that at a proper time;* for if a man is indicted and has a pardon in his pocket, and afterwards puts himself upon his trial by pleading the general issue, he has waived the benefit of such pardon.

*Id.* at 163 (emphasis added) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *401). Under these circumstances, Bar Counsel might well have argued, perhaps with some prospect of success, that as a result of Abrams' concession before the Board, he (Abrams) was precluded from asking this court to dismiss the disciplinary proceeding on the basis of the presidential pardon.

Abrams contends, however, that the pardon deprives this court of subject matter jurisdiction, *but cf. Wilson, supra,* and that the jurisdictional issue may be raised at any time and could not have been waived. Bar Counsel has elected not to challenge this contention, and there has therefore been no adversarial crossing of swords with respect to whether a pardon deprives the court of jurisdiction over the disciplinary proceeding. Moreover, because we rule in Bar Counsel's favor with respect to the effect of the pardon, our disposition of the case is the same as it would have been if we had treated the point as having been waived. Accordingly, we will assume, solely for the sake of argument, and without deciding the question, that Abrams' contention based on the pardon is properly before us.

## B. The Merits.

### (1) General considerations.

President Bush pardoned Abrams pursuant to Article II, Section 2, Clause 1 of the Constitution, which authorizes the President to "grant Reprieves and Pardons for Offenses against the United States, except in cases of Impeachment." Although a violation of the District of Columbia Rules of Professional Conduct is not a crime, and certainly not "an offense against the United States," *see In re Bocchiaro*, 49 F.Supp. 37, 38 (W.D.N.Y.1943) (President lacks authority to pardon state offenses), Abrams contends that the presidential pardon directed to his federal convictions precludes this court from imposing any disciplinary sanction based on his testimony before the Congressional committees. He relies heavily on the following language from the majority opinion in *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380–81, 18 L.Ed. 366 (1866):

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, *it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence.* If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

(Emphasis added.)

According to Abrams, the quoted language requires this court, in effect, to pretend that his pardoned wrongdoing never happened. Although Abrams deceived three Congressional committees, and although he has admitted that he deceived at least two of them, he contends that the pardon precludes us from considering that wrongful conduct in assessing his moral character for the purpose of bar discipline.

The implications of Abrams' position are troubling to say the least. Let us consider an apt analogy. Suppose that an alcoholic

surgeon performs an operation while intoxicated. He botches the surgery. The patient dies. The surgeon is convicted of manslaughter and is sentenced to imprisonment. The President grants him a full and unconditional pardon. According to Abrams, the surgeon now has the right, as a result of the pardon, to continue to operate on other patients, without any interference from the medical licensing authorities.[7] The proposition that the alcoholic but pardoned surgeon (or, by analogy, a habitually inebriated and unsafe airline pilot) cannot be disciplined is, in our view, altogether unacceptable and even irrational, and it has been emphatically rejected by the courts. *See, e.g., People v. Rongetti,* 395 Ill. 580, 70 N.E.2d 568, 569–70 (1946), *Page v. Watson,* 140 Fla. 536, 192 So. 205, 209–10 (1938); *State v. Hazzard,* 139 Wash. 487, 247 P. 957, 958–60 (1926).

A more reasonable approach to the effect of a pardon, which avoids the incongruous result for which Abrams contends, was suggested by Professor Samuel Williston in his landmark article, *Does a Pardon Blot Out Guilt?,* 28 HARV.L.REV. 647 (1915). After comparing the passage from *Garland* which we have quoted at page 10, *supra,* with the court's earlier and quite different assessment of the nature of a pardon,[8] and after explaining the precedents both before and after *Garland,* Professor Williston concluded:

> The true line of distinction seems to be this: The pardon removes all legal punishment for the offence. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. *On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prose-*

*cution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.*

*Id.* at 653 (emphasis added).

"The fundamental distinction suggested by Professor Williston has been generally accepted and followed by the courts since the date of his article." *Damiano v. Burge,* 481 S.W.2d 562, 565 (Mo.App.1972). The parties have not cited, and our research has not disclosed, a single decision by any federal, state, or other court (*Abrams I* excepted) which has rejected Professor Williston's reasoning. As will be apparent, see pp. 11–17, *infra,* the position of the Department of Justice is also consistent with Professor Williston's. We discern no basis in law, justice, or reason to challenge this overwhelming trend.

#### (2) *The nature of the proceeding.*

It is important to note at the outset what this case is *not* about. Bar Counsel has not asked the court to disbar Abrams on account of his having been convicted of a crime of moral turpitude. *Cf. In re Hopmayer,* 625 A.2d 290 (D.C.1993); D.C.Code § 11–2503(a) (1996). The presidential pardon would undoubtedly have precluded a sanction based on Abrams' conviction, and Abrams did not, in any event, commit such a crime. Instead, the proceeding was brought to discipline Abrams for engaging in *conduct* which, according to Bar Counsel, violated the Code of Professional Responsibility. Although the case was precipitated in part by Abrams' criminal convictions,[9] the existence *vel non* of a criminal conviction is not dispositive of the question whether Abrams violated his ethical obligations as an attorney. The central question in a disciplinary proceeding is

---

7. Abrams' attorney effectively conceded at oral argument that the foregoing hypothetical is indistinguishable from the present case in terms of the effect of the pardon.

8. "A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts *for a crime he has committed."*
*Wilson, supra,* 32 U.S. (7 Pet.) at 160 (emphasis added). The Supreme Court reiterated in *Bur-*

*dick v. United States,* 236 U.S. 79, 91, 35 S.Ct. 267, 269, 59 L.Ed. 476 (1915) that the acceptance of a pardon implies a confession of guilt.

9. Two of the three disciplinary charges against Abrams parallelled the allegations in the indictment, but the third, which was based on his testimony of November 25, 1986, arose out of conduct for which he has not been indicted. See note 5, *supra.*

whether the attorney has adhered to the high standards of honor and integrity which membership in our profession demands, and not whether he has been criminally punished for any derelictions.

"The Bar is a noble calling." *In re Shillaire*, 549 A.2d 336, 337 (D.C.1988). "[T]he right to practice law not only presupposes in its possessor integrity, legal standing, and attainment, but also the exercise of a special privilege, highly personal, and partaking of the nature of a public trust." *In re Lavine*, *supra*, 41 P.2d at 162. High standards of honor, integrity and professional competence have been in effect for attorneys since the reign of Henry IV. *See In re Bozarth*, 178 Okla. 427, 63 P.2d 726, 727 (1936) (citations omitted).

▪ Responsibility for the discipline of attorneys admitted to the bar of the District of Columbia is vested in this court. *See* D.C.Code §§ 11–2501, –2502 (1995); D.C. Bar R. XI, § 1 (1996). Disciplinary sanctions are designed to maintain the integrity of the profession, to protect the public and the courts, and to deter other attorneys from engaging in similar misconduct. *In re Reback*, 513 A.2d 226, 231 (D.C.1986) (en banc). "Our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney;[10] rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." *In re Steele*, 630 A.2d 196, 200 (D.C.1993) (citation and footnote omitted); *see also Reback*, *supra*, 513 A.2d at 231.

> "The question is," said Lord Mansfield, "whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion.... *It is not by way of punishment;* but the court[s] in such cases exercise their discretion, whether a man whom they have formerly admitted is a

proper person to be continued on the roll or not."

*Ex parte Wall*, 107 U.S. 265, 273, 2 S.Ct. 569, 576, 27 L.Ed. 552 (1883) (emphasis added).

Because the obligation to protect the public from the unethical practitioner and to maintain the honor and integrity of the profession does not depend on a prosecutor's pursuit or non-pursuit of criminal penalties, the courts have rejected the notion that the pardon of an attorney relieves them from carrying out their disciplinary responsibilities. Chief Judge (later Justice) Cardozo made the point well for a unanimous court in *In re Kaufmann*, 245 N.Y. 423, 157 N.E. 730 (1927):

> There must be convincing proof of innocence before pardon will restore to the fellowship of the bar. Even innocence of crime will not suffice if there has been a failure to live up to the standards of morality and honor. Pardon does no more than open the door to an inquiry that would otherwise be barred. That much, however, it does.

*Id.* 157 N.E. at 733.[11] In other words, the pardon of an attorney "does not of itself invest him with those essentials required of an attorney-at-law." *Feinstein v. State Bar*, 39 Cal.2d 541, 248 P.2d 3, 7 (1952) (citations omitted).

### (3) *District of Columbia authorities.*

There is no District of Columbia case law squarely in point on the issue before us. The authority that does exist, however, is consistent with Professor Williston's approach and favors Bar Counsel's position.

In *Bowles v. Laws*, 59 App. D.C. 399, 45 F.2d 669 (1930), *cert. denied*, 283 U.S. 841, 51 S.Ct. 488, 75 L.Ed. 1452 (1931), the court stated by way of dictum that "a [presidential] pardon wipes out the offense against the public, but does not annul the act or *affect*

---

**10.** Disciplinary proceedings not being penal in nature, Abrams' reliance on decisions holding that a pardon blots out the penal consequences of an offense, *see, e.g., United States v. Klein*, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871);

*United States v. Padelford*, 76 U.S. (9 Wall.) 531, 543, 19 L.Ed. 788 (1869), is misplaced.

**11.** In *Kaufmann*, the petitioner was pardoned after his disbarment, and was seeking reinstatement on the basis of the pardon. Judge Cardo-

*the right of the court to punish* [12] *for professional misconduct." Id.* at 401, 45 F.2d at 671 (emphasis added; citation omitted). The Board on Professional Responsibility reached the same conclusion in *Felt, supra,* and the Hearing Committee did likewise in the present case. The court in *Bowles,* the Board in *Felt,* and the Hearing Committee in *Abrams* were all unanimous.

### (4) *Federal authorities.*

So far as we are aware, all of the federal appellate decisions in this century which have considered the effect of a presidential pardon have adopted the approach suggested by Professor Williston and have rejected the position urged on us by Abrams.

The closest case to the present one is *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122 (7th Cir.1977). Grossgold, an attorney, had been convicted of mail fraud and suspended from practice. He was subsequently pardoned by the President. He sought reinstatement to the Illinois Bar, claiming that his suspension had been based on the pardoned offense, and that it had therefore been nullified by the pardon. The Court of Appeals unanimously held that the trial court had lacked federal jurisdiction over the case. The court then added the following:

> Assuming federal jurisdiction *arguendo,* the presidential pardon did not wipe out the moral turpitude inherent in the factual predicate supporting plaintiff's mail fraud conviction. As Judge Sprecher carefully explained in *Bjerkan v. United States,* 529 F.2d 125, 128 n. 2 (7th Cir.1975), a pardon does not blot out guilt nor restore the offender to a state of innocence.

The court quoted with approval the passage from Professor Williston's article reproduced at page 11, *supra,* and concluded that because good character is a necessary qualification for the practice of law, and because Grossgold's conduct was incompatible with good moral character, the fact that he had been pardoned did not relieve him from professional discipline. *Id.* at 125–26 (additional citations omitted).[13]

In *United States v. Noonan,* 906 F.2d 952 (3d Cir.1990), a defendant who had received a presidential pardon for a violation of the Selective Service Act asked the court to expunge the records of his prosecution and conviction. Invoking *Garland,* he claimed that the pardon had wiped out his guilt and that, in the eyes of the law, his offense *no longer existed.* Relying on the decisions in *Grossgold* and *Bjerkan* and on Professor Williston's article, the court, in an opinion by Judge Aldisert, held that Noonan was not entitled to expungement. Characterizing as "dictum" the statement in *Garland* that a pardon "blots out of existence the guilt," *id.* at 958 (quoting 71 U.S. at 380), Judge Aldisert stated that the Supreme Court had abandoned the *Garland* dictum in *Burdick v. United States,* 236 U.S. 79, 91, 35 S.Ct. 267, 269, 59 L.Ed. 476 (1915).[14] Quoting from *Bjerkan, supra,* 529 F.2d 125, 128 n. 2 (7th Cir.1975), Judge Aldisert explained that

> the fact of conviction after a pardon cannot be taken into account in subsequent proceedings. However *the fact of the commission of the crime may be considered. Therefore, although the effects of the commission of the offense linger after a pardon, the effects of the conviction are all but wiped out.*

*Id.* at 958–59 (emphasis added). The presidential pardon, according to the court, "does not create any factual fiction that Noonan's conviction had not occurred [or] justify ex-

zo's language is nevertheless revealing as to what a pardon can or cannot do.

**12.** "Discipline" would have been a more accurate word than "punish."

**13.** The discussion in *Grossgold* of the effect of a pardon must be regarded as dictum in light of the court's holding as to federal jurisdiction.

**14.** In *Burdick,* the Court stated that "confession of guilt [is] implied in the acceptance of a pardon." 236 U.S. at 91, 35 S.Ct. at 269. This statement was viewed by the court in *Noonan* as irreconcilable with the notion that a pardon "blots out" guilt. *See also Nixon v. United States,* 506 U.S. 224, 232, 113 S.Ct. 732, 737, 122 L.Ed.2d 1 (1993) ("the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is [a]n executive action that mitigates or sets aside *punishment* for a crime.") (Emphasis in original) (quoting BLACK's LAW DICTIONARY 1113 (6th ed.1990)).

punction of his criminal court record." *Id.* at 960.

In *In re North,* 314 U.S.App. D.C. 102, 62 F.3d 1434 (1994) (per curiam), Clair E. George, a C.I.A. official who had been pardoned (along with Abrams) for his role in the Iran–Contra matter, applied for an award of counsel fees. Fees were available, under the applicable statute, to those individuals who had not been indicted. George had been indicted, but he argued that the pardon had "blotted out" the indictment against him. Like Abrams, George relied heavily on *Garland.*

The court ruled, with one judge dissenting, that the pardon did not blot out the existence of the indictment, and that George was not eligible for an award of counsel fees. Just as the court in *Noonan* had done, the court in *North* characterized *Garland's* "blot[ting] out" language as "dictum." *Id.* at 105, 62 F.3d at 1437. The court noted Chief Justice Marshall's definition of a pardon in *Wilson,* 32 U.S. (7 Pet.) at 160, which we have quoted in note 8, *supra,* and stated that

> Garland's rationale is consistent with *Wilson;* its dictum blotting out guilt is inconsistent with *Wilson. Garland*'s dictum was implicitly rejected in *Burdick* [*supra* ], 236 U.S. 79 [35 S.Ct. 267, at 91, 35 S.Ct. at 269], which recognized that the acceptance of a pardon implies a confession of guilt.

*Id.* (citations omitted).

In *In re Spenser,* 22 F. Cas. 921 (Cir.Ct. D.Or.1878), Judge Deady wrote an excellent opinion in which, in effect, he anticipated Professor Williston's article, as well as *Grossgold* and the other decisions written a century or so after *Spenser.* William Spenser sought to become a citizen of the United States. In order to be eligible for citizenship, he was required to demonstrate, *inter alia,* that "he ha[d] behaved as a man of good

moral character." While residing in this country, however, Spenser had been convicted of perjury. He subsequently received an "unqualified" pardon from the governor. The question before the court was whether, in light of *Garland,* Spenser's perjury had been "blotted out," so that he was once again a man of good moral character. Notwithstanding *Garland,* the court answered that question in the negative:

> By the commission of the crime, the applicant was guilty of misbehavior, within the meaning of the statute, during his residence in the United States. The pardon has absolved him from the guilt of the act, and relieved him from the legal disabilities consequent thereupon. But it has not done away with the fact of his conviction. It does not operate retrospectively. The answer to the question: Has he behaved as a man of good moral character? must still be in the negative; for the fact remains, notwithstanding the pardon, that the applicant was guilty of the crime of perjury— did behave otherwise than as a man of good moral character.

*Id.* at 923. Thus, in a case decided only a few years after *Garland,* a federal judge made the very distinction which Professor Williston articulated in his article and which the courts in the later decisions adopted as their *ratio decidendi. See also United States v. Swift,* 186 F. 1002, 1017 (N.D.Ill. 1911) (the post-Civil War cases "dispel the idea that the acts themselves, as distinguished from their penal consequences, were obliterated by pardon or amnesty.... A pardon or amnesty ... involves forgiveness, not forgetfulness.")

(5) *State court decisions.*

So far as our research has disclosed, the state courts which have considered the effect of a presidential or gubernatorial pardon [15]

---

15. At least two of the state court decisions on which we have relied in this opinion involved presidential pardons. *See People v. Brophy,* 287 N.Y. 132, 38 N.E.2d 468, 469 (1941) *cert. denied,* 317 U.S. 625, 63 S.Ct. 62, 87 L.Ed. 506 (1942); *In re Kaufmann, supra,* 157 N.E. at 731. Moreover, we have found no indication in the case law that the effect of a gubernatorial pardon differs from that of a presidential one. Indeed, in *North,* our colleagues across the street relied

on *State v. Skinner,* 632 A.2d 82, 85 (Del.1993), a decision of the Supreme Court of Delaware involving a gubernatorial pardon, as authority for its assessment of the effect of a presidential pardon; the court also alluded to the "state cases" cited in *Skinner. North, supra,* 314 U.S.App. D.C. at 105, 62 F.3d at 1437. Professor Williston cited federal and state court decisions as to the effect of a pardon more or less interchangeably. *See, e.g.,* 28 HARV.L.REV. at 653 n. 20.

have likewise unanimously rejected the contention that such a pardon bars a disciplinary proceeding against an attorney if that proceeding is based on the attorney's underlying conduct. *See Damiano, supra,* 481 S.W.2d at 565 (Professor Williston's analysis has been "generally accepted and followed"). In the words of then Chief Judge Cardozo, writing for a unanimous court, "[p]ardon blots out the offense and all its penalties, forfeitures and sentences, *but the power to disbar remains." Rouss, supra,* 116 N.E. at 783.

The courts have reached this conclusion because, as the Supreme Court of California has recognized, the pardon of an attorney "does not of itself reinvest him with those essentials required of an attorney-at-law." *Wettlin v. State Bar,* 24 Cal.2d 862, 151 P.2d 255, 259 (1944) (per curiam) (citation omitted). It does not efface ". . . the want of professional honesty involved in the crime. . . ." *People v. Gilmore,* 214 Ill. 569, 73 N.E. 737, 737 (1905). "[T]he underlying conduct as representing fitness for the legal profession is still a concern, even though the criminal aspect has been excused or expunged by the pardon." *In re Harrington,* 134 Vt. 549, 367 A.2d 161, 164 (1976). Indeed, "no responsible court could refuse to acknowledge the possibility that, [notwithstanding the pardon,] the undesirable fact of criminal conduct might still be of concern on the issue of probable fidelity to ethical standards." *Id.* 367 A.2d at 165.

As the Supreme Court of Florida explained in *State v. Snyder,* 136 Fla. 875, 187 So. 381 (1939), "the very fact of embezzlement is cause for disbarment, and a pardon does not blot out that fact." *Id.* 187 So. at 381–82. The pardon relieves the offender of the *penal* consequences of his conduct, *In re Lavine, supra,* 41 P.2d at 163, but disciplinary sanctions are not a part of the punishment for the crime. *Snyder, supra,* 187 So. at 382; see also discussion at pages 11–12, *supra.*

It is because an attorney's continued integrity is so important that "a pardon does not deprive the court of the right to exercise its

undoubted inherent power to say, upon a sufficient showing of dishonorable or unprofessional conduct, that an attorney is not befitted [sic] to engage in the practice of law." *In re Rudd,* 310 Ky. 630, 221 S.W.2d 688, 689 (1949) (per curiam). This principle applies equally to a physician, for a pardon will not "erase the stain of bad character." *Hazzard, supra,* 247 P. at 959. Accordingly, a court will not automatically permit the pardoned physician "to practice a profession which demands peculiar qualifications in order to protect the public, and [which] requires a license." *Id.* at 960.[16]

Perhaps the leading state court case on the relation between a pardon and a disciplinary proceeding against an attorney is *Nelson v. Commonwealth,* 128 Ky. 779, 109 S.W. 337 (1908). Nelson had been convicted of forgery. He received a pardon from the governor. Disbarment proceedings were brought against him, and he interposed the pardon as a defense. The court held that the pardon did not preclude the imposition of discipline:

[W]hile the general effect of a pardon as to the restoration of rights and privileges and the creation of a new credit and capacity may be conceded, the fact that a pardon has been granted to a person convicted of an offense cannot warrant the assertion that such a person is as honest, reliable, and fit to hold a public office as if he has constantly maintained the character of a law-abiding citizen.

*Id.* 109 S.W. at 338. The court stated that although the pardon could blot out the offense for which he was convicted, *"it cannot wipe out the act that he did,* which was adjudged an offense. It was done, and will remain a fact for all time." *Id.* (emphasis added). The court continued:

While the effect of the pardon was to relieve him of the penal consequences of his act, it could not restore his character. It did not reinvest him with those qualities which are absolutely essential for an attorney at law to possess. It could not reha-

---

16. It has also been held that a pardon will not automatically restore a liquor license, *Damiano, supra,* 481 S.W.2d at 565–66, or a taxicab license, *Baldi v. Gilchrist,* 204 A.D. 425, 198 N.Y.S. 493, 495 (1st Dept.1923), or a real estate

broker's or salesperson's license, *Stone v. Oklahoma Real Estate Comm'n,* 369 P.2d 642, 645–46 (Okla.1962) (per curiam), because each of these occupations requires possession of good moral character or its equivalent.

bilitate him in the trust and confidence of the court. Lawyers are officers of the court. They are agents through whom justice must be administered. They should always be worthy instruments of justice. Courts should never hesitate to disbar those who are morally unfit to act as such agents.

*Id.* at 340.

We have found no authority to the contrary. In *Scott v. State,* 6 Tex.Civ.App. 343, 25 S.W. 337 (1894), the court held that a proceeding to disbar Scott, which had been brought solely on the basis of Scott's conviction of a felony, was barred by Scott's receipt of a pardon from the governor. The court, however, explicitly recognized and distinguished authorities holding that a pardon would not operate as a bar to a disciplinary proceeding if that proceeding were based upon facts showing professional misconduct, rather than on the felony conviction alone. *Id.* 25 S.W. at 339.[17] The court in *Scott* thus recognized the validity of the very distinction which Professor Williston was to propound in his article twenty-one years later.

We note that almost all of the decisions of federal and state courts which have followed Professor Williston's approach have been unanimous.[18]

### (6) *The views of the Department of Justice.*

On June 19, 1995, in a Memorandum to the Pardon Attorney, the Honorable Walter Dellinger, then Assistant Attorney General for the Office of Legal Counsel (and now Acting Solicitor General), addressed the very issue presented in this case. He wrote, in pertinent part, as follows:

In *Garland* the Court stated that a pardon makes the offender ... as innocent as if he had never committed the *offense."  Id.* (emphasis added). We do not interpret this to mean that the pardon creates the

fiction that the *conduct* never took place. Rather, a pardon represents the Executive's determination that the offender should not be penalized or punished for the offense. There may be instances where an individual's conduct constitutes not only a federal offense, but also a violation of a separate code of conduct or ethics that the individual is obligated to comply with by virtue of his or her professional license. Discipline associated with the breach of the conditions of a professional license, where the disciplinary action is not triggered merely by the fact of commission or conviction of a federal offense, generally would not be barred by a pardon.

For example, an attorney charged with a criminal offense for which he or she is later pardoned by the President would be relieved of all consequences that attached solely by reason of his commission of the offense. However, the pardon would not necessarily prevent a local or state bar from disciplining the attorney, if it independently determined that the underlying conduct, or some portion of it, violated one of its canons of ethics. In those instances, the bar would not have based its decision to disbar or sanction the attorney on the fact that the attorney had violated the criminal laws of the United States, but rather would have conducted an inquiry into the conduct and determined that an ethical violation had occurred. Several state courts have taken this approach when considering the effect of a gubernatorial pardon on state disbarment proceedings. *See e.g., Nelson v. Commonwealth,* 128 Ky. 779, 109 S.W. 337 (Ky.1908); *In re Lavine,* 2 Cal.2d 324, 41 P.2d 161 (Cal. 1935); *In re Bozarth,* 178 Okla. 427, 63 P.2d 726 (Okla.1936).

### (7) *The Garland decision.*

Because Abrams relies so heavily on *Ex parte Garland, supra,* we address that case

---

**17.** In *Nelson, supra,* the court distinguished *Scott* upon this very ground.

**18.** Other cases which support our disposition include *State v. Skinner, supra* note 15; *In re Beck,* 264 Ind. 141, 342 N.E.2d 611, 614–15 (1976), and authorities there cited; *Louisiana*

*State Bar Ass'n v. Ponder,* 263 La. 743, 269 So.2d 228, 230 (1972), *cert. dismissed,* 411 U.S. 901, 93 S.Ct. 1532, 36 L.Ed.2d 303 (1973); *In re Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732, 733–34 (1927); *see also* 7 C.J.S. Attorney & Client § 73, at 970–71 & n. 80 (1980 & Supp.1996).

in some detail. Shortly after the Civil War, Congress provided by statute that any person seeking the right to practice before a court of the United States must take an oath affirming that he had neither aided the Confederacy during the war nor held office in the Confederate government. Garland, who had been a member of the Supreme Court bar before the war, served as a member of the Confederate Congress during the Rebellion, and he was therefore unable to take the oath. Upon receiving a full and unconditional pardon from President Andrew Johnson, Garland petitioned the Supreme Court for the right to continue to practice before that Court without taking the prescribed oath.

The Court, by a vote of 5–4, held that the Act of Congress which imposed the requirement of this oath was "subject to the constitutional inhibition against the passage of bills of attainder." 71 U.S. (4 Wall.) at 377. Further, in the majority's view, the statute was "brought within the further inhibition of the Constitution against the passage of an *ex post facto* law." *Id.* After holding the Act unconstitutional on these grounds, Justice Field wrote that the Court's conclusion to that effect was "strengthened by a consideration of the effect of the pardon." *Id.* at 380. Justice Field then added the passage, quoted at page 10, above, in which the pardon was described as "blot[ting] out" the offense. *Id.*

In light of the Court's holding on the "bill of attainder" and "*ex post facto* law" issues, the discussion of the presidential pardon was unnecessary for its disposition of the case. By the time Justice Field reached the issue of the pardon, the case had already been decided. Irrespective of the pardon, the statute was deemed invalid on other constitutional grounds. The courts, both federal and state, have thus accurately described the "blot[ting] out" discussion in *Garland* as "dictum." *North, supra,* 62 F.3d at 1437; *Noonan, supra,* 906 F.2d at 958; *Skinner, supra,* 632 A.2d at 84; *see also Lavine, su-*

*pra,* 41 P.2d at 164 ("[t]he additional discussion [in *Garland*] as to the effect of the pardon was unnecessary to the decision.")[19]

More fundamentally, the problem before the court in *Garland* was quite different from the one presented here. *Garland* did not involve a disciplinary proceeding against an individual attorney for violating his ethical responsibilities. Rather, that case dealt with a statutory enactment which, in one fell swoop, retroactively destroyed the right of numerous attorneys to practice law before the federal courts. That blanket disqualification, after the fact, of all who had served the Confederacy was the statute's principal vice. The Court had no occasion in *Garland* to decide the question whether an individual attorney who had violated applicable ethical requirements could escape disciplinary sanctions on the basis of a presidential pardon.

There is, moreover, language in *Garland* which significantly undermines Abrams' reliance on that decision. After reasoning that the Act of Congress at issue "operate[d] as a legislative decree of perpetual exclusion" from the bar and that such "exclusion from any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment," 71 U.S. at 377, the Court distinguished an exclusion of this sort from the authority of a *court* "to determine who is qualified to become one of its officers, as an attorney and counsellor, *and for what cause he ought to be removed.*" *Id.* at 379 (emphasis added) (quoting *Ex parte Secombe,* 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856)). Upon entry of the order admitting them to practice, attorneys "become officers of the court, and *are responsible to it for professional misconduct.*" *Id.* at 378 (emphasis added). In *Garland,* however, the Act of Congress which effectively disbarred the respondent offended the principle that the right to practice law by one admitted to do so "is something more than a mere indulgence, revocable at the pleasure of the court, or at

---

**19.** It is especially significant that, in *North,* the United States Court of Appeals for the District of Columbia Circuit viewed the relevant passage in *Garland* as dictum. It would be unseemly indeed for the "blot[ting] out" language to be treated as binding precedent in the District of Columbia courts, but as non-binding in the federal

courts sitting in the District of Columbia. We should therefore "treat [*North*] as persuasive authority both on the basis of its reasoning and in the interest of harmony between court systems and uniformity of result in the same geographic area." *Hornstein v. Barry,* 560 A.2d 530, 536–37 n. 15 (D.C.1989) (en banc) (citation omitted).

the command of the legislature. It is a right of which [the attorney] *can only be deprived by the judgment of the court, for moral or professional delinquency.*" 71 U.S. at 379 (emphasis added).

Considering the majority opinion in *Garland* in its entirety, we agree with the following statement by the New York Court of Appeals in *In the Matter of ———, An Attorney,* 86 N.Y. 563 (1881), decided only fourteen years after *Garland:*

> If, in a case like *Ex parte Garland (supra),* though we are far from intimating that such a supposition was possible in that case, it had been shown that an attorney used the rebellion, and aided it, for the purpose and with the effect of wronging his clients, the U.S. Supreme Court, we think, would not have ignored that act, to which the rebellious acts were ancillary, and while holding that the public offense was obliterated by the pardon, they would, in considering his application to be restored to the rolls of the court, have taken cognizance of his infidelity to his clientage.

*Id.* at 572–73.

Moreover, Abrams' construction of *Garland* is inconsistent with the Supreme Court's subsequent holding in *Carlesi v. New York,* 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914). Carlesi was found guilty in the courts of New York of the offense of forgery. He had previously been convicted in the United States District Court of selling and possession of counterfeit currency, but the President had pardoned him for the earlier crime. Notwithstanding the pardon, the judge in the state court case treated the pardoned offense as constituting a prior conviction. Accordingly, in conformity with a state sentence enhancement statute, the judge sentenced Carlesi as a second offender. Relying, *inter alia,* on *Ex parte Garland,* Carlesi contended that "[t]he President's pardon obliterated the first offense," so that Carlesi could not thereafter be prosecuted as a second offender. *Id.* at 53, 34 S.Ct. at 577. The Supreme Court held, however, that New York's use of the pardoned federal conviction to enhance Carlesi's sentence for the forgery

did not constitute punishment for the pardoned earlier offense, and that "the contention as to the effect of the pardon here pressed [by Carlesi] is devoid of all merit. . . ." *Id.* at 59, 34 S.Ct. at 578. The result in *Carlesi* cannot be reconciled with the notion that the presidential pardon "blot[ed] out" of existence the conduct that led to Carlesi's federal conviction.

As noted by the court in *North,* the broad reading of the "blot[ting] out" language in *Garland* for which Abrams contends is also difficult to reconcile with the Supreme Court's pre-*Garland* decision in *Wilson* and with its post-*Garland* reiteration of *Wilson* in *Burdick.* See *North, supra,* 62 F.3d at 1437. In addition, the Supreme Court of California has explained:

> That the situation presented in the Garland Case was unique was recognized in *Hawker v. New York,* 170 U.S. 189, [198, 18 S.Ct. 573, 577, 42 L.Ed. 1002 (1898)] wherein it is stated that the Garland Case merely determined that: "One who has been admitted to practice the profession of the law, cannot be deprived of the right to continue in the exercise [thereof] by the exaction * * * of an oath as to * * * past conduct, respecting matters which have no connection with such profession." [20] The peculiar situation presented in the Garland Case is also recognized in *State v. Hazzard, supra,* 247 P. [at 958], wherein it is stated that the Garland "decision has been robbed of much of its virility by later decisions of the court."

*In re Lavine, supra,* 41 P.2d at 164.

Perhaps the most perceptive assessment of the portion of the *Garland* opinion on which Abrams relies was that of Judge Lehman, writing for a unanimous New York Court of Appeals:

> Literally, of course, an executive pardon cannot "blot out of existence the guilt" of one who committed a crime. At most it can wipe out the legal consequences which flow from an *adjudication* of guilt. In *Ex parte Garland, supra,* the court gave to the presidential pardon no greater effect.

---

**20.** But notwithstanding *Hawker,* we should think that treasonable activities have some connection to an attorney's moral character and with fitness for the practice of law.

The court decided only that "the effect of this pardon is to relieve the petitioner from all penalties and disabilities attached to the offence of treason, committed by his participation in the Rebellion. So far as that offence is concerned, he is thus placed beyond the reach of punishment of any kind." 4 Wall. [71 U.S. at] 381. To illuminate a decision in which a bare majority of the court concurred and which was rendered while the passions roused by the rebellion still clouded the judgment of most citizens, the court used, appropriately enough, a metaphor; but metaphors cannot appropriately be used to justify a conclusion which would follow logically only if the metaphor were not a figure of speech but an accurate description.

*Brophy, supra,* 38 N.E.2d at 470.

At least since 1915, the federal and state courts have uniformly ruled that Professor Williston had it right and that the Supreme Court's use of metaphor in the *Garland* opinion does not compel a contrary conclusion. We now adopt the prevailing view.[21]

## IV.

### THE SANCTION

■ As reflected in the concurring and dissenting opinions that follow, Judges Ferren, Schwelb, and Farrell are of the opinion that Abrams should be suspended from practice for six months. Judge Ruiz would adopt the Board's recommendation that Abrams be suspended from practice for one year. Judge King is of the opinion that Abrams should receive a public censure. Chief Judge Wagner and Judges Terry, Steadman, and Reid believe that the presidential pardon precludes this court from imposing any sanction at all.

There is thus no specific sanction which commands the support of a majority of the court. Public censure, however, is a less severe disposition than suspension from practice. Under the unusual circumstances here presented, and solely in order to enable the court to dispose of the case, the four judges who believe that Abrams should be suspended from practice have agreed that the sanction proposed by Judge King should be imposed. Accordingly, in conformity with D.C.Code § 11–2502 (1995), Elliott Abrams, Esq. is hereby publicly censured for professional misconduct.

*So ordered.*

SCHWELB, Associate Judge, with whom FERREN and FARRELL, Associate Judges, join, concurring:

Although, solely for the reasons explicated in the opinion of the court, the three judges who subscribe to this concurring opinion have voted to impose a public censure, we believe that the appropriate sanction would be suspension from practice for six months. Our reasons for taking this position are set forth below.

### A. Scope of review.

The Board's recommendation that Abrams be suspended for one year emerged from a somewhat unusual sequence of events during the course of the disciplinary process. At the conclusion of the hearing before the Hearing Committee, Bar Counsel—the prosecuting authority in disciplinary proceedings—proposed that Abrams be censured,

---

**21.** *Abrams also relies on a number of other Civil War era Supreme Court cases in which the Court made broad statements regarding the effect of a pardon. In Knote v. United States, 95 U.S. 149, 24 L.Ed. 442 (1877), for example, a case involving a man pardoned following his "treason and rebellion," the Court declared that the pardon "releases the offender from all disabilities imposed by the offence and restores him to all civil rights." Id. at 153 (emphasis added). In Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892), the Court held that a pardoned offender was competent to testify because "the disability to testify being a consequence ...* of the judgment of conviction, *the pardon obliterated that effect." Id.* at 453–54, 12 S.Ct. at 294 (emphasis added). *These and other like decisions cited by Abrams are distinguishable upon the common ground that each dealt with the consequences of conduct that was sanctionable solely because it was criminal. None of these cases involved a situation, such as that presented here, in which good moral character is a prerequisite for participation in the pardoned person's profession, and in which conduct incompatible with good moral character is subject to discipline whether or not it violates any criminal law.*

but did not request that he be suspended from practice.

In a post-hearing brief, Bar Counsel modified his earlier recommendation and suggested a thirty-day suspension. The Hearing Committee, however, viewed Abrams' conduct far more seriously. The Committee recommended that he be suspended for one year.

In his brief to the Board, Bar Counsel again recommended a thirty-day suspension, notwithstanding the Hearing Committee's proposal. The Board, apparently after considerable reflection,[1] ultimately agreed with the Hearing Committee's recommendation. One Board member, in dissent, proposed a six-month suspension instead. Bar Counsel now takes the position that, in light of the limited scope of our review of the Board's proposed sanction, this court should follow the recommendation of the Board.

"In determining the appropriate order, the [c]ourt shall ... adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. BAR R. XI § 9(g)(1). This court's review of the Board's proposed sanction is therefore deferential. As we show below, however, the facts before us are significantly different in kind from those in any of our prior cases. We agree with the Board that

> [g]iven the wide-ranging precedents with respect to sanctions in dishonesty cases, the unusual nature of the wrongful conduct constituting the dishonesty here, and the unique combination of mitigating factors, it is apparent that setting the appropriate sanction here will require a high degree of subjectivity.

Where "this court has had little occasion [in the past] to pass upon conduct such as [that here] ..., our role in reviewing the Board's

recommendation may be more assertive than in more familiar types of misconduct." *In re Schneider*, 553 A.2d 206, 211 (D.C.1989); *accord, In re Reback*, 513 A.2d 226, 230 (D.C. 1986) (en banc). We should also give some consideration in our calculus to the fact that the Board's recommended sanction is far more severe than that initially suggested by the prosecuting agency.

### B. The seriousness of the misconduct.

The Hearing Committee, after analyzing the extensive record in this case in painstaking detail,[2] unanimously concluded that Abrams' violations were extremely serious. The Committee found that on three separate occasions, Abrams "violated the most basic professional obligation of a lawyer—the pledge to maintain honesty and integrity." The Committee further found that Abrams' conduct

> was knowing and willful and continued over a period of time. It was not an impulsive, isolated act.... [Abrams] ... knowingly allowed outside pressures and personal ideologies to suppress his ethical obligation to be honest and forthright.

The Committee described Abrams' conduct as "a corruption of our governmental processes."

After praising the Hearing Committee's Report, the Board essentially adopted the Committee's analysis. The Board concluded that "a serious violation has been committed in this case and that a serious sanction is warranted." Abrams, according to the Board, "was not telling 'little white lies' in a social setting, nor was he exchanging quips in good-natured badinage." Rather, his false testimony related to "urgent matters of vital public interest in an environment where his remarks were highly significant." The Board was of the opinion that "lying to Con-

---

1. The Board's Report states that "the initial reaction of some Members was that the Hearing Committee's recommendation for a one-year suspension seemed overly harsh." This reaction was based in part on Abrams' forceful *pro se* argument and "the strong sense of sincerity and unfair treatment that he ably communicated."

2. The Board described the Hearing Committee's report in this case as "a model of clarity and thoroughness." We agree, and we take this opportunity to express our appreciation to Paul L. Knight, Esq., Chair of the Hearing Committee, and Susan L. Leighton, Esq. and Carolyn Kennedy, Esq., members of the Committee, for their conscientious efforts in an especially complex and difficult matter.

gress *does* reflect on an attorney's fitness to practice law." (Emphasis in original).

Abrams contended that his Congressional testimony was not "practice-related." The Board, citing *In re Shorter,* 570 A.2d 760, 767–68 (D.C.1990), and *In re Kent,* 467 A.2d 982 (D.C.1983), rejected the contention that lack of "practice-relatedness" precluded or substantially mitigated the imposition of sanctions. The Board further indicated that Abrams' testimony *was* practice-related, in the sense that "a lawyer's intentional and repeated lying in testimony before Congressional Committees is … an adverse reflection on that lawyer's fitness to practice law." We agree with the Board. We also note that although Abrams did not formally appear before the committees in his capacity as an attorney, he was acting, in effect, as a representative of the government and defending its position. This activity, while often performed by non-attorneys, is *not* so very different, as a practical matter, from what lawyers do.

Abrams has acknowledged, at least implicitly, that his violations were serious. He testified that "the Senate Intelligence testimony was *very bad* testimony." (Emphasis added.) He described as "a statement I should never have made" his representation that "we were not in the fund raising business." Abrams has thus effectively conceded that some of his testimony was untrue and that he ought not to have made false representations to Congress.[3]

## C. Mitigating factors.

Both the Hearing Committee and the Board recognized the presence in this case of significant mitigating factors. Some of these factors were of the traditional variety, while others were based on the unusually sensitive and difficult position in which Abrams found

himself when he was called upon to testify before Congress.

The Board concisely summarized the first category of mitigating considerations as follows:

> The Hearing Committee … considered the more "traditional" mitigating factors—such as: (a) that [Abrams] had not had any prior discipline during 13 years of membership in the Bar; (b) that [he] had had a distinguished career in government service and in prior law practice; and (c) that [he] had cooperated with both the Congressional Iran–Contra inquiry and the Independent Counsel's investigation.[4] The Hearing Committee even felt it significant that Mr. Abrams' actions "were not motivated by financial gain."

The existence of these traditional mitigating factors is not in dispute, and we view them as significant.

Abrams has also cited the mitigating "context" in which he acted, and the Hearing Committee and the Board both gave sympathetic consideration to this concern. The Committee noted that Abrams was a

> political appointee operating in a political environment and defending the President's foreign policy against political opposition. Honesty in a political context is sometimes more nebulous than in the legal context.

(Footnote omitted).

The Hearing Committee also recognized that the subject matter of Abrams' testimony dealt with "extremely sensitive intelligence information." The Committee noted that on October 10, 1986, one of the members of the Senate Foreign Relations Committee mused rhetorically regarding whether it might be in the national security interest for the government to have a policy to lie about sensitive intelligence information. The Senator then

---

3. Abrams claims—and the claim is not implausible—that his admission of wrongdoing reflects forthrightness and contrition on his part, and should therefore mitigate his sanction.

4. The Independent Counsel, Lawrence Walsh, Esq., wrote a letter to Bar Counsel in which he stated that the imposition of disciplinary sanctions against Abrams would result in Abrams' being treated more severely than non-attorney

defendants whose roles in the Iran–Contra affair were more culpable than Abrams' role. The Board stated, however, and we reiterate that "[l]awyers have a greater duty than ordinary citizens to be scrupulously honest at all times, for honesty is basic to the practice of law." *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc) (citations omitted).

stated, without contradiction from anyone present:

> Well, I guess it seems to me that it probably is appropriate from time to time. I hate to say that. It goes against the grain for all of us.

The Hearing Committee also agreed "to a certain extent" with Abrams' contention that "the Independent Counsel and Bar Counsel have reviewed his testimony under stricter criteria than [those which Abrams] believed were in effect (or which were in effect) when he testified." The Committee stated, however, that "this is a matter which only should be considered in mitigation."

The Hearing Committee took note of the fact that Abrams' "misconduct and criminal convictions are well known across the country," and that "this public humiliation is severe punishment in and of itself, particularly where a lawyer such as [Abrams] has had a distinguished career and where he highly values his reputation." Abrams now argues, and we agree, that Abrams' humiliation has been compounded by the fact that the wheels of justice have moved slowly in this case, which began more than a decade ago. It is also significant that during the intervening years, Abrams has incurred no further disciplinary charges.

Abrams contended before the Board that the Hearing Committee had not accorded sufficient weight to the mitigating factors that he had presented to the Committee. The Board rejected this contention and, at least implicitly, adopted the Hearing Committee's analysis of the mitigating factors. Both the Committee and the Board concluded that these factors, significant as they were, were not sufficient to warrant a sanction less severe than suspension for one year.

### D. The case law.

In its Report and Recommendation, the Board prepared an excellent synopsis of our precedents in cases of dishonesty. We quote that synopsis in its entirety.

> Our precedents indicate that in dishonesty cases where there has not been a long-term pattern of misconduct, the range of sanctions goes from public censure to disbarment. At the "public censure" end

of the continuum, we have *In re Austern,* 524 A.2d 680 (D.C.1987) (where the lawyer assisted his client in fraudulent conduct in connection with a real estate closing), and *In re Hadzi–Antich,* 497 A.2d 1062 (D.C. 1985) (where the lawyer made false statements on a resume). A 30–day suspension was ordered in *In re Miller,* 553 A.2d 201 (D.C.1989), even though there was significant mitigation evidence to offset the dishonest conduct (which involved the unauthorized search of law firm personnel files), and *In re Schneider,* 553 A.2d 206 (D.C. 1989) (where the lawyer altered his firm expense accounts to reimburse himself for expenses *actually incurred*). In *In re Waller,* 573 A.2d 780 (D.C.1990), the lawyer was suspended for 60 days for making misrepresentations to the Court to avoid being disqualified based on a conflict of interest. Three-month suspensions were ordered in *In re Kennedy,* 542 A.2d 1225 (D.C.1988) (where there was a misstatement concerning financial data on a bank application); *In re Sandground,* 542 A.2d 1242 (D.C.1988) (where the lawyer assisted his client in providing false interrogatory answers in a divorce proceeding); and *In re Thomas,* M–94–81 (D.C.1982) (where the lawyer lied at his own deposition and furnished a false interrogatory answer in a *pro se* matter) [unpublished]. The lawyers in *In re Reback,* 513 A.2d 226 (D.C.1986) (*en banc*) were suspended for six months for forging their client's signature on a complaint and filing it with the Court; but neglect was also involved.

> Cases involving one-year suspensions are *In re Kerr,* 611 A.2d 551 (D.C.1992); *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (*en banc*) (where the lawyer gave false testimony under oath to the SEC to conceal his own illegal insider trading); *In re Thompson,* 538 A.2d 247 (D.C.1985[1987]) (where the lawyer assisted his client in making false statements on an INS application); and *In re Wild,* 361 A.2d 182 (D.C.1976), where the lawyer made illegal campaign contributions. The Court's recent decision in *In re Shorter,* 570 A.2d 760 (D.C.1990), involved illegal conduct that was also found to constitute dishonesty.

In that case, the Court upheld *disbarment* of the lawyer for dishonest conduct surrounding his conviction for willful failure to pay taxes and willful tax evasion.

The Hearing Committee, which cited many of the above cases, found Abrams' conduct most similar to that in *Hutchinson* and *Wild.* The Board added *Shorter* to the list, and stated that "in the context of sanctions imposed by the [c]ourt in cases like *Hutchinson, Wild,* and *Shorter,* it is difficult for us to see any basis for recommending a more lenient sanction than the Hearing Committee recommends."

### E. Analysis.

. We recognize that both the Hearing Committee and the Board approached the issue of the appropriate sanction responsibly and thoughtfully. We agree with much of each body's analysis. Nevertheless, as we show below, this case is quite unlike others which have been cited to us as precedents. We routinely defer to the Board as to sanctions, in part in order to avoid inconsistent dispositions for similarly situated respondents. Abrams' situation is not similar to that of the respondents in the cases cited to us.

The Board and the Hearing Committee relied heavily on *Hutchinson* and *Wild,* but the present case has a significant, even critical, feature which is absent from those cases. Abrams was testifying about highly sensitive matters affecting intelligence and, arguably, the national security. This made it very difficult for him to answer forthrightly and candidly all of the questions posed to him during the course of his testimony.

The case against Abrams rests, in substantial part, on his statements that he knew of no foreign government that was providing assistance to the Contras. In fact, Abrams was well aware of the contribution made by the Sultan of Brunei. Former Secretary of State George Schultz advised the sentencing judge in Abrams' criminal case, however, that "we had given a pledge of absolute confidentiality to that government." It is surely understandable that Abrams was not ready to disclose publicly the Sultan's role in the matter, in violation of that pledge, and thus to undermine the credibility of the United States.

The Board was of the opinion that

> Mr. Abrams did not have to testify if he could not tell the truth. He could have resigned or taken the Fifth Amendment. He chose not to do so.

In our view, however, the matter is considerably more complex than that.

We discern no basis in the record for invocation by Abrams of the privilege against self-incrimination. Resignation was, of course, an option. For someone holding a position such as Assistant Secretary of State to resign, however, resignation obviously entails substantial costs to the public in terms of the continuity of government policy. Moreover, such a course of action might have presented potential problems which are not readily resolved by a conclusory comment that Abrams "could have" given up his post.[5]

No comparable situation existed in *Hutchinson* or in *Wild.* Hutchinson had lied under oath before the Securities and Exchange Commission to shield himself and a friend from potential criminal and civil liability and to protect his own illegal profits. *Hutchinson,* 534 A.2d at 920–23. Wild made illegal corporate campaign contributions after being pressured to do so by a member of the Cabinet, and he lied to and deceived the company's shareholders in order to prevent public disclosure of a political gift by a corporation. *Wild,* 361 A.2d at 183.[6] Neither case involved a situation in which candid disclosure would have compromised sensitive intel-

---

5. The Board did not indicate when this hypothetical resignation could or should have been submitted. If Abrams had truthfully answered the Congressional inquiries about Saudi Arabian involvement, for example, but if he had then resigned upon being asked about Brunei, then the pledge of confidentiality to the Sultan would surely have been fatally undermined. Presumably, the Board believed that such a decision could or should have been made before Abrams testified, in order to avoid the possibility that he would have to choose between lying or disclosing sensitive information.

6. Both Hutchinson and Wild were convicted of criminal offenses. Unlike Abrams, neither man was pardoned.

ligence information or imperiled the integrity of a pledge of confidentiality to a foreign government. No Senator would have volunteered that it might have been appropriate for Hutchinson or Wild to tell the lies they told. Rather, the dishonest conduct of the respondents in those cases was designed to prevent the disclosure of unlawful acts and to protect the respondents or their friends and associates.

Although one might fairly say that Abrams found himself between a rock and a hard place, we do not suggest that his dilemma excused his lying. His own admission that he gave "very bad" testimony implies that he could have done very much better. He surely knew, or should have known, before being called to testify, that he might be asked questions about matters as to which he would not wish to disclose the truth. If his superiors expected him to lie, then he should not have testified. We are persuaded, however, that the circumstances which we have discussed significantly mitigate his culpability and materially distinguish this case from *Hutchinson* and *Wild*.

In *District of Columbia Bar v. Kleindienst*, 345 A.2d 146 (D.C.1975) (en banc) (per curiam), Richard Kleindienst, Deputy Attorney General of the United States, who had been nominated for the position of Attorney General, falsely denied during his confirmation hearing, under oath, that anyone at the White House had attempted to influence the Department of Justice in relation to a pending antitrust suit. In fact, President Nixon had ordered Kleindienst to drop the matter. The Board recommended that Kleindienst be suspended from practice for one year. This court, however, ordered a thirty-day suspension. Subsequently, in *Hutchinson, supra,* we overruled *Kleindienst* as to sanction, implicitly holding that a longer suspension should have been imposed in that case. *Hutchinson,* 534 A.2d at 927.[7]

*Kleindienst* is comparable to the present case in that if the respondent had been candid, his testimony would have seriously embarrassed the President. In light of that and other similarities,[8] Hamilton P. Fox, III, the dissenting member of the Board, reasoned as follows on the basis of *Kleindienst* and *Hutchinson:*

> If we assume that the [c]ourt's ruling in *Hutchinson* signals us that [thirty] days was too lenient for Kleindienst and recognizing that [Abrams] lied on three different occasions before three separate Committees, I believe that a suspension for six months is the appropriate sanction.

As the Hearing Committee correctly stated, Abrams' deception of Congress "was knowing and willful and continued over a period of time." We agree with the Board that this is not a case of "little white lies" or of good-natured "badinage." On the contrary, the record reflects serious misconduct. Having given careful consideration to the recommendation of the Board, as well as to the views of the Hearing Committee and to the arguments of counsel, we believe that Abrams should be suspended from the practice of law for a period of six months. Because there are only four votes for suspension rather than five, however, we join Judge

---

7. Judge Ferren, who was a member of the Board at the time of the *Kleindienst* case and joined the recommendation that Kleindienst be suspended for one year, is of the opinion that the sanction then recommended by the Board was appropriate. Judges Schwelb and Farrell do not reach that question, except to reiterate this court's declaration in *Hutchinson* that a thirty-day suspension was inadequate—substantially inadequate, in our view.

8. Kleindienst was confirmed as Attorney General and served in that capacity. Like Abrams, he had a distinguished record of prior public service. Like Abrams, he entered a plea of guilty to a misdemeanor. Unlike Abrams, however, Kleindienst did not receive a presidential pardon.

We do not suggest that avoidance in *Kleindienst* of political embarrassment of the President was as legitimate and important a consideration as the preservation in this case of the integrity of an assurance of confidentiality to a foreign government. Indeed, we agree with Judge King, *post,* at 25 n. 2, that the present case is distinguishable from *Kleindienst* in significant respects. We cannot agree with Judge King, however, that public censure is a sufficient sanction for a lawyer who lied to Congress on three separate occasions on matters of substantial national importance. This case ought not to be equated with, *e.g., In re Hadzi–Antich, supra,* 497 A.2d at 1064–65, in which a lawyer was publicly censured for exaggerating his qualifications on his resume.

King in ordering that Abrams be publicly censured.

KING, Associate Judge, concurring:

I agree with Judge Schwelb that the disciplinary system could properly consider this matter and there is sufficient support for the Board's conclusion that respondent committed the charged violations. Judge Schwelb and two other judges, however, would impose a six-month suspension as a sanction. Judge Ruiz would adopt the Board's recommended sanction of a one-year suspension. For the reasons stated below, I would order a public censure rather than a suspension.

## I.

The determining issue before the *en banc* court is whether the pardon given to respondent by President Bush requires dismissal of the disciplinary proceedings. Ordinarily we would not reach that question under the circumstances presented here because, by expressly and unequivocally conceding before the Board on Professional Responsibility ("Board") that the pardon did not preclude the bringing of this disciplinary proceeding, respondent waived that claim. *See In re Ray*, 675 A.2d 1381, 1386 (D.C.1996) (where respondent did not present his contention to the Board, he "cannot be heard to raise it for the first time here"); *In re James*, 452 A.2d 163, 168–69 (D.C.1982) (same). Although I am of the view that we should resolve this issue against respondent on the ground that he has waived it, the remaining members of the court have decided to address the question whether the pardon bars imposition of disciplinary sanctions.[1] Therefore, I will do

so as well. On that issue, I am in full agreement with Judge Schwelb. Accordingly, I join the introductory remarks and Parts I, II, III B and IV of his opinion for the court.

## II.

I part company with Judge Schwelb, however, on the sanction to be imposed in this case. I do agree with much of what he says in his separate concurring opinion, particularly in section E where he demonstrates the defects in the reasoning underlying the Board's recommendation, and where he explains how respondent's conduct was quite unlike the conduct of other attorneys who have been suspended, for similar disciplinary violations, for periods of up to one year. *See. e.g., In re Hutchinson*, 534 A.2d 919 (D.C. 1987) (en banc); *In re Wild*, 361 A.2d 182 (D.C.1976). I do not agree, however, that a six-month suspension, which Judge Schwelb and his two colleagues would impose, or the longer suspension which Judge Ruiz would impose, is appropriate in this case.

The governing rule provides that we should adopt the Board's disposition "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct, ..." D.C. Bar R. XI, Section 9(g). Judge Schwelb's choice of a six-month suspension is a conscientious attempt on his part, to apply that principle. His concurring opinion persuades me, however, that we have never before been presented with a case involving comparable conduct, together with the surrounding circumstances, that are presented by this case.[2] Therefore, we are es-

---

1. Judge Schwelb and the judges joining him have assumed for the sake of argument, without deciding the point, that the issue was preserved. The four dissenting judges, by concluding that the pardon bars imposition of any disciplinary sanction, necessarily have decided that the issue has been preserved.

2. The only case at all comparable to respondent's, as Judge Schwelb correctly observes, is *District of Columbia Bar v. Kleindienst*, 345 A.2d 146 (D.C.1975) (en banc). Kleindienst pled guilty to violations of 2 U.S.C. § 192 (willful failure to answer questions pertinent to a Congressional inquiry), the same offense pled to by Abrams, and this court ordered that Kleindienst

serve a thirty-day suspension. *Id.* at 149. We later held, however, that Kleindienst's thirty-day suspension was too lenient, suggesting, but not explicitly holding, that the length of the suspension in those circumstances could range up to one year. *In re Hutchinson*, 534 A.2d 919, 927 (D.C.1987) (en banc). Although respondent and Kleindienst both pled guilty to the same offense, the underlying circumstances were very different. First, the self-interest factor applied to Kleindienst, then the Deputy Attorney General of the United States, who was testifying in connection with his own nomination to be Attorney General. That factor does not apply to respondent's testimony. Nor was respondent's testimony related to the practice of law as Kleindienst's

sentially writing on a clean slate and the precedents relied upon provide little or no guidance.

When there is no precedent pointing to the appropriate sanction, we must look to other factors. In doing so, I conclude that the sanction we should impose is the one Bar Counsel urged upon the Hearing Committee at the end of its proceedings. At that point, when the evidence was fresh in the minds of everyone, Bar Counsel, the prosecuting authority in this disciplinary proceeding, recommended that a public censure be imposed. Later, however, Bar Counsel, for an asserted reason which is not particularly persuasive,[3] changed its recommendation from a public censure to a suspension of at least thirty days, a sanction considerably less severe than the one-year suspension recommended by the Hearing Committee and the Board, and the six-month suspension reached by Judge Schwelb and the judges joining him. In my view, Bar Counsel's sanction recommendation, where the recommended sanction is more lenient than the one proposed by the Board, although certainly not conclusive, should be given great weight.

No doubt Bar Counsel's initial recommendation was influenced, as I am, by the remarks of the Independent Counsel for Iran/Contra Activities, Mr. Lawrence E.

Walsh, who supervised the criminal investigation which resulted in respondent's guilty plea. In a letter to Bar Counsel before the matter was presented to the Hearing Committee, Mr. Walsh observed:

In view of the sentences imposed upon other participants in Iran/Contra activities, some of them far more directly involved than Mr. Abrams, *added disciplinary sanctions by the Bar would single out Mr. Abrams for punishment much more severe than that received by others.*

Without minimizing the gravity of the crime, the following factors would seem relevant to the determination of the committee:

1. Mr. Abrams was not acting as a lawyer in the activity he was indicted;

2. He was not acting for personal gain in connection with this activity.

Beyond this, by pleading guilty he saved the government the burden of a lengthy trial and he avoided the possibility of exacerbating his misconduct.

Since pleading guilty he has cooperated with this Office and made himself available as a witness. Although it would be inappropriate for me to give the details of this cooperation, I should like at least to char-

---

was. Second, Kleindienst was questioned exhaustively for four days while under oath. The Board found, and this court agreed, that Kleindienst was "guilty of direct and repeated misrepresentations in answering persistent inquiries about White House involvement in Justice Department litigation...." *Kleindienst, supra,* at 146–47. No such finding was made, nor would it be warranted, with respect to respondent's unsworn responses to questioning. It bears emphasizing on this point that Kleindienst's misrepresentations were made under oath while respondent's were not. Therefore, the real offense, in contrast to the offense pled to, in Kleindienst's case was a far more serious violation of the law than Abrams's real offense. Third, unlike respondent's circumstances, the information withheld by Kleindienst was entirely within his personal knowledge. Moreover, it was the precise information being sought at the hearing and for which the hearing was reconvened. Finally, Kleindienst was not pardoned by the president and the prosecuting attorney in his criminal case did not recommend that no disciplinary sanction be imposed.

3. In its post-hearing proposed findings of fact, conclusions of law, and recommendations for

sanctions, Bar Counsel, for the first time, recommended a suspension of at least thirty days. Bar Counsel gave no reason for changing its recommendation from one of public censure, other than stating that "[u]pon considered review of the record and the governing precedent we depart from the tentative recommended sanction suggested at the hearing." The pardon was issued after the conclusion of the hearing, where the public censure recommendation was made, but before Bar Counsel submitted its new recommendation. In response to the new recommendation, respondent "respectfully submit[ted] that the pardon is responsible for [Bar Counsel's] change in recommendation." Respondent also observed: "I am aware that a pardon does not end this disciplinary matter, but I cannot believe it will result in *additional* punishment of me" (emphasis in original). Later, Bar Counsel insisted that its new recommendation was not made in response to the pardon but was due to "further study of the *Kleindienst* precedent." *See Hutchinson, supra,* 534 A.2d at 927 (overruling *Kleindienst* to the extent it deals with question of appropriate sanction).

acterize it by saying that we regard it as important. Such help is particularly valuable to a temporary office such as this one. Anything that prolongs our litigation prolongs the necessary existence of an independent office. Mr. Abrams has helped in this regard. If he were to be subjected to additional disciplinary punishment, in spite of his cooperation, this could increase the resistance of others who will have comparable opportunity to cooperate.

Letter of March 5, 1992, from Independent Counsel Lawrence E. Walsh to the Office of Bar Counsel (emphasis added). It is fair to assume that Mr. Walsh was as aware as anyone could be of the nature, effect, and gravity of respondent's wrongdoing. Yet he recommended that no further discipline be imposed. That recómmendation should not be rejected absent compelling grounds for doing so. I find none here.

In this matter, where there is no comparable case to use as a guide, and where the prosecutor in the criminal case recommended that respondent not be subject to any bar disciplinary sanctions at all, and where the prosecutor in the disciplinary proceeding first recommended a public censure and later essentially recommended a thirty-day suspension, it is inappropriate to impose a six-month suspension as Judge Schwelb would do. Therefore, for the reasons stated, I would impose a sanction of public censure and no more.

RUIZ, Associate Judge, concurring:

I fully agree with the majority opinion that the Presidential pardon of Mr. Abrams' criminal conviction did not deprive us of authority to discipline Mr. Abrams and that the evidence presented supports the conclusion that

1. We do not know the views of our dissenting colleagues who have not weighed in on the question of sanction because they believe the court to be without power to act following the Presidential pardon.

2. In the separate concurrences of my colleagues in the majority rationalizing that either public censure or a six-month suspension is the appropriate sanction for this case, they implicitly defer to the Board's recommendation in another case. Both begin with the assertion that the facts of this case are "significantly different" from those in any case previously before us. Nonetheless,

he committed the violations of professional rules with which he is charged. I write separately only to state my views concerning the sanction.

Bar Counsel originally requested a public censure. After the hearing (and after the pardon), Bar Counsel modified his request to a thirty-day suspension. The Hearing Committee thought otherwise, recommending a one-year suspension. The Board on Professional Responsibility agreed with the Hearing Committee's recommendation that Mr. Abrams be suspended for a year, with one dissenting member recommending a six-month suspension. On appeal, Bar Counsel urges that we follow our usual rule of deference to the Board's recommendation on sanction and adopt the Board's recommended one-year suspension. Thus, as the case comes before us, the Hearing Committee, Bar Counsel and the Board are aligned in their recommendation that Mr. Abrams be suspended for one year.

Five judges of the en banc court are deciding this case. Notwithstanding the recommendation before us, we are imposing public censure, not because all the judges in that bare majority agree it is the appropriate sanction, but because it is the "least common denominator" among the five: three of the judges, Judges Ferren, Schwelb and Farrell, would impose a six-month suspension; only one, Judge King, thinks that a public censure is the appropriate sanction. I tend to think neither of those sanctions reflects the seriousness of Mr. Abrams' misconduct.[1] In light of the majority's divergent views on the matter of sanction, deference to the Board's recommendation is the most principled rule for deciding this case.[2]

Beyond this unwarranted departure from our usual rule of deference, I am troubled by

both then go on to evaluate Mr. Abrams' misconduct in light of the circumstances and sanction in the case involving former Attorney General Richard Kleindienst who, though not pardoned by the President, was similarly convicted of lying to Congress. Both conclude that Mr. Abrams' conduct was not as venal as Mr. Kleindienst's, and therefore, should receive a sanction less harsh than that imposed on Mr. Kleindienst.

Even though the rationale that Mr. Kleindienst's sanction should act as a cap on Mr. Abrams' sanction has some logical appeal, it immediately falls apart in application for the

the message that may be perceived from the public censure being imposed in this case. Mr. Abrams was a high government official who lied to the Congress on three separate occasions concerning a matter of intense public interest. My colleagues' angst-ridden analysis of Mr. Abrams' predicament in having to choose between lying and hewing to the Administration's position, including a promise of confidentiality to a foreign state, does not recognize that, concomitant with the receipt of public trust inherent in a public position, must come acceptance of responsibility to the public. The Congress to which Mr. Abrams lied represents that public. Coming from a court that *disbars* solo and small firm practitioners who, other than as a result of simple negligence, have used client funds in the operation of their firms, the public censure imposed in this case can only be viewed as a meager slap on the wrist for repeated intentional misconduct by an attorney entrusted with the additional responsibilities of a public position.

In sum, the better part of wisdom in this case would have been to follow our usual rule of deferring to the Board's recommendation. My hope is that the public censure imposed here will be dismissed in future cases as highly idiosyncratic, necessitated by the wide-ranging views on the matter within the thin majority in this court. Like *Kleindienst*, *Abrams* should be no precedent as to sanction.

TERRY, Associate Judge, with whom Chief Judge WAGNER and Associate Judges STEADMAN and REID join, dissenting:

My view of this case is fundamentally different from that of my colleagues in the

simple reason that this court has never said what Mr. Kleindienst's sanction should have been. Mr. Kleindienst received a thirty-day suspension. *District of Columbia Bar v. Kleindienst*, 345 A.2d 146, 149 (D.C.1975). In *In re Hutchinson*, however, we overruled *Kleindienst* as to sanction, explicitly saying that "we hereby overrule ... *Kleindienst* to the extent that [it] deal[s] with the question of appropriate sanctions for disciplinary violations." 534 A.2d 919, 927 (D.C.1987) (en banc). What we did not say in *Hutchinson* was what Mr. Kleindienst's sanction *should* have been—nor do my colleagues in their concurrences in this case say what they now think it should have been. Lurking in their concur-

majority. They examine Mr. Abrams' conduct in lying to three congressional committees, decide that it warrants the imposition of a disciplinary sanction, and assert that the court cannot "close its eyes to the fact that Abrams did what he did." *Ante* at 7. I approach the case from a different angle. The issue, as I see it, is whether this court, has any power to act, not whether Mr. Abrams should be disciplined for his admitted misconduct. I am firmly convinced that the full and unconditional pardon which President Bush bestowed on Mr. Abrams on Christmas Eve in 1992, less than four weeks before leaving office, instantly and permanently deprived this court of all power to impose any sanction whatsoever. Thus it does not matter whether Mr. Abrams is a saint or a scoundrel; "the fact that Abrams did what he did" is utterly irrelevant. I am satisfied that my position is solidly supported by controlling Supreme Court precedent, and thus I respectfully dissent from the majority's disposition of this case.

## I.

The essence of Mr. Abrams' argument is that a full and unconditional presidential pardon prevents this court from imposing any sanction based on the conduct for which he was pardoned. To support his broad interpretation of the Pardon Clause of the Constitution, he places great reliance on a series of post-Civil War decisions by the Supreme Court. In response, Bar Counsel asserts that these cases have been uniformly criticized by other federal and state courts and may no longer be regarded as reliable prece-

rences, therefore, is the unstated assumption that the one-year suspension recommended by the Board for Mr. Kleindienst should have been adopted by the court. If so, Mr. Abrams' conduct, which my colleagues seem to believe is not as reprehensible as Mr. Kleindienst's, should be sanctioned by a significantly lesser sanction than a one-year suspension—a six-month suspension or public censure. As my colleagues do not independently evaluate and approve the Board's recommendation in *Kleindienst*, however, they implicitly are deferring to what the Board there recommended. If deference was appropriate in the *Kleindienst* case, why not here?

dent. Accordingly, Bar Counsel urges us to hold that a full and unconditional presidential pardon does not affect attorney disciplinary sanctions like the one recommended here. In order to address these arguments, one must examine the historical origins and the Supreme Court's subsequent interpretations of the Pardon Clause.

### A. The Historical Background of the Pardon Clause

Article II, Section 2, Clause 1 of the Constitution of the United States states in part: "The President ... shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." Historical accounts of the Constitutional Convention of 1787 reveal that the Founders engaged in very little discussion about the meaning or scope to be given to the President's pardoning authority.[1] Instead, it seems to have been accepted that the presidential power would be virtually identical to that exercised by the King of England, except that the President's authority to grant pardons would not extend to "cases of impeachment." *Ex parte Grossman*, 267 U.S. 87, 112–113, 45 S.Ct. 332, 334, 69 L.Ed. 527 (1925); *see also Ex parte Wells*, 59 U.S. (18 How.) 307, 311, 15 L.Ed. 421 (1855) ("In the convention which framed the constitution, no effort was made to define or change [the meaning of the word 'pardon'], although it was limited in cases of impeachment").[2] As Chief Justice Marshall explained in an early case:

As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

*United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160, 8 L.Ed. 640 (1833).[3] Later, in the *Wells* case, in defining the term "pardon" as it was used in England at the time of the Constitutional Convention, the Supreme Court declared: "A pardon is said by Lord Coke to be a work of mercy, whereby the king, either before attainder, sentence, or conviction, or after, forgiveth any crime, offence, punishment, execution, right, title, debt, or duty, temporal or ecclesiastical...." *Ex parte Wells, supra,* 59 U.S. (18 How.) at 311 (citation omitted). But even under the English monarchy, the power to pardon was not absolute. For instance, the King's pardoning authority extended only to the matters of "public interest"; it had no effect, for example, on the right of a third party to obtain a private judgment against the recipient of the pardon. *Ex parte Grossman, supra,* 267 U.S. at 111, 45 S.Ct. at 333–334.[4]

The Supreme Court established from the outset that the Pardon Clause, like its English model, was to be broadly construed. For example, in *United States v. Wilson, supra,* the Court described a pardon as "an act of grace, proceeding from the power en-

---

1. The greatest debate concerning the Pardon Clause arose when Edmund Randolph of Virginia introduced a measure to prohibit the President from issuing pardons in cases of treason. The measure was rejected, however, when Randolph refused to accept a compromise that would have granted the pardoning power in treason cases to the President and the Senate jointly. Daniel T. Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King,* 69 Tex.L.Rev. 569, 590–591 & n. 132 (1991).

2. The view that the scope of the President's pardoning power should be modeled after that of the English King was not universally held. In *Ex parte Wells, supra,* Justice McLean argued in dissent that "[t]he executive office in England and that of this country [are] so widely different,

that doubts may be entertained whether it would be safe for a republican chief magistrate, who is the creature of the laws, to be influenced by the exercise of any leading power to the British sovereign." 59 U.S. (18 How.) at 318.

3. *See also* The Federalist No. 69 (Alexander Hamilton) (president's pardoning power "resembl[es] equally that of the King of Great–Britain and the Governor of New–York") (quoted in *Schick v. Reed,* 419 U.S. 256, 263, 95 S.Ct. 379, 383, 42 L.Ed.2d 430 (1974)).

4. *See also Ex parte Wells, supra,* 59 U.S. (18 How.) at 312–313 (describing common law and statutory limitations on the King's pardoning power); Kobil, *supra* note 1, 69 Tex.L.Rev. at 587–588 (same).

trusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed." 32 U.S. (7 Pet.) at 160.[5] Moreover, in *Ex parte Wells, supra,* the Court held that the President had authority to condition the issuance of a pardon on the recipient's assent to a wide array of terms. 59 U.S. (18 How.) at 314.[6] In so ruling, the Court first recognized that conditional pardons were an accepted part of the English crown's clemency power. *Id.* at 313. Turning then to the actual language of the Constitution, the Court concluded that Article II, Section 2 extended "the power to pardon to all kinds of pardons known in the law as such, whatever may be their denomination. We have shown that a conditional pardon is one of them." *Id.* at 314. Thus, from the first judicial interpretations of the Pardon Clause, it was apparent that the President's pardoning authority was expansive and closely aligned with that of the English King.

*B. The Post–Civil War Supreme Court Decisions*

During and after the Civil War, Presidents Abraham Lincoln and Andrew Johnson exercised their pardoning authority extensively by granting individual amnesties to supporters of the rebellion.[7] These executive measures were necessary to prevent the bringing of treason charges against former Confederate soldiers and sympathizers. William F. Duker, *The President's Power to Pardon: A Constitutional History,* 18 WM. & MARY L.REV. 475, 510–512 (1977). As a result, several cases raising issues of first impression about the scope of the President's pardoning power found their way to the Supreme Court.

The first such case, and the one that most closely resembles the case before us, was *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866). Garland was an attorney from Arkansas who had been admitted to the Supreme Court bar in 1860. During the Civil War, he served in the Congress of the Confederacy. In January 1865 Congress passed legislation, later implemented by a Supreme Court rule, requiring that in order to practice law in any federal court, all attorneys must take a loyalty oath stating that they had never given aid or comfort to any enemy of the United States. Shortly after this law was enacted, Garland received a full pardon for his actions during the Civil War. Since he could not take the required oath because of his service in the Confederate Congress, he petitioned the Supreme Court for permission to continue practicing as an attorney, arguing *inter alia* that the pardon relieved him of any obligation to take the oath.

Basing its decision in part on a broad reading of the President's pardoning authority, a majority of the Court granted Garland's petition. In defining the scope of the pardoning power, the Court declared:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new

---

**5.** However, because a pardon, like a deed, is a "private, though official act" which is "not communicated officially to the court," the Court held in *Wilson* that a recipient of a pardon must present it to a court "by plea, motion or otherwise" in order to enjoy its benefit. 32 U.S. (7 Pet.) at 160–161. Thus, while a pardon bestows on its recipient a far-reaching reprieve from the punitive consequences of his or her wrongdoing, it is not a self-executing instrument.

**6.** At issue in *Wells* was whether the President could condition the issuance of a pardon to a defendant sentenced to death for murder on his acceptance of a sentence of life imprisonment. The Court held that he could.

**7.** The Supreme Court made clear on at least two occasions that the power to grant amnesty is inherent in the President's pardoning power. *See Knote v. United States,* 95 U.S. 149, 152–153, 24 L.Ed. 442 (1877); *United States v. Klein,* 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871).

man, and gives him a new credit and capacity.

*Id.* at 380–381. To this expansive statement the Court added but a single limitation, consistent with similar restrictions on the pardoning authority of the English King. The Court cautioned that a presidential pardon, by itself, "does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment." *Id.* at 381 (footnote omitted).[8]

A few years later, in *Carlisle v. United States,* 83 U.S. (16 Wall.) 147, 21 L.Ed. 426 (1872), the Court once again spoke broadly in interpreting the scope and effect of a full presidential pardon. The plaintiffs in *Carlisle* were British subjects living in Alabama. During the Civil War, Union forces had seized sixty-five bales of cotton, belonging to them, which had been stored on a plantation there. Because the plaintiffs had provided "aid and comfort to the rebellion" by furnishing materials to the Confederacy for use in the manufacture of gunpowder, *id.* at 150, the cotton was sold and its proceeds deposited in the United States Treasury. Thereafter the plaintiffs, who had received a full pardon for their wartime activities, filed suit against the United States under the Captured and Abandoned Property Act in which they sought to recover the proceeds from the sale of the seized cotton. The Court of Claims dismissed their case because of their involvement with the Confederacy, but the Supreme Court reversed. Justice Field, writing for a unanimous Court, elaborated:

> It is true, the pardon and amnesty do not and cannot alter the actual fact that aid and comfort were given by the claimants, but they forever close the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened.

There has been some difference of opinion among the members of the court as to cases covered by the pardon of the President, but there has been none as to the effect and operation of a pardon in cases where it applies. *All have agreed that the pardon not merely releases the offender from the punishment prescribed for the offence, but that it obliterates in legal contemplation the offence itself.*

*Id.* at 151 (emphasis added).

Following *Garland* and *Carlisle*, the Court in *Knote v. United States, supra* note 7, described a presidential pardon as "an act of grace" which "releases the offender from all disabilities imposed by the offence, and restores to him all his civil rights." 95 U.S. at 153. Mr. Knote, like the plaintiffs in *Carlisle,* was the owner of property which had been confiscated by the United States because of his assistance to the Confederate cause. The property had been condemned and sold by court order, and the proceeds of the sale had been deposited in the Treasury of the United States. After Knote received a full presidential pardon, he sued for recovery of those proceeds. Justice Field, again writing for the entire Court, stated that such a pardon gives its recipient "a new credit and capacity and rehabilitates him to that extent in his former position." *Id.* The Court nevertheless rejected his claim, holding that the pardon, by itself, did not entitle him to take money out of the Treasury because it was no longer his money:

> [I]f the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon possessed by the

---

8. The Court struck down the statute requiring the oath as a bill of attainder and an *ex post facto* law before addressing the pardon issue. *Ex parte Garland, supra,* 71 U.S. (4 Wall.) at 377. As a result, Bar Counsel argues that the Court's pardon discussion is dictum and that *Garland* "is a case of more historical interest than precedential value." In my view, this is a misreading of *Garland;* the Court's pardon analysis was a substantial part of its opinion. Moreover, I see no significance at all, as the majority evidently does, *ante* at 16–17, in the order in which the Court considered Garland's various arguments. In any event, as I shall discuss in a moment, many of the Court's subsequent pardon decisions reiterate the language of *Garland* in accepting its broad definition of a full and unconditional pardon. Thus *Garland* can only be seen as the first brick in a solid wall of precedent.

President ... it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress. The Constitution places this restriction on the pardoning power.

*Id.* at 154.[9] Notwithstanding this limitation, *Knote* stands, like its predecessors, for the proposition that a full presidential pardon has the effect of abolishing any legal disabilities flowing from the pardoned conduct. The failure of Knote's claim resulted not from any disability on his part, but from the altered status of the sale proceeds once they were deposited in the Treasury.

The Supreme Court reiterated its broad interpretation of the Pardon Clause in several other cases decided in the period following the Civil War. For instance, in *Osborn v. United States,* 91 U.S. 474, 477, 23 L.Ed. 388 (1875), the Court declared, "It is of the very essence of a pardon that it releases the offender from the consequences of his offence." Thus, although a pardon may not interfere with the private rights of third parties ("such rights ... necessarily remain as they existed previously to the grant of the pardon"), the Court made clear that an unconditional pardon bars the government from penalizing the offender in any way for the conduct underlying the pardon. Hence the Court held that a forfeiture of Osborn's property ordered by a United States District Court, under an 1862 statute authorizing the confiscation of property belonging to persons giving aid and comfort to the rebellion, must be set aside because he had been pardoned for his wartime activities. Since Osborn had fulfilled all the requirements of the pardon, and since his property was still within the control of the federal court in Kansas that ordered the forfeiture[10] (unlike the situation in *Knote*), the Supreme Court ruled that the property had to be restored to him. "[U]nless rights of others in the property condemned have accrued, the penalty of forfeiture annexed to the commission of the offence must fall with the pardon of the offence itself...." *Id.*[11]

### C. Later Supreme Court Decisions

The Supreme Court has consistently followed the precedents it established in the post-Civil War cases concerning the scope and effect of a full presidential pardon. For instance, in *Ex parte Grossman, supra,* the Court held that a full presidential pardon extended to criminal contempt of court. In so ruling, the Court rejected the argument that the authority to punish for contempt rested solely with the judiciary and that any effort by the President to undermine that power would violate the principle of separation of powers. 267 U.S. at 98, 45 S.Ct. at 332. Rather, the Court noted that there were only two limitations on the President's pardoning authority. First, a pardon could not be granted in cases of impeachment, as specified in the Constitution; second, a pardon could not affect the rights of third parties against the pardoned offender, as established in the common law. *Id.* at 111–112, 45 S.Ct. at 333–334. Thus, even in those areas where the judiciary's authority is said to be dominant, such as criminal contempt, a president may intervene and nullify the sanctions

---

**9.** The claimants in *Carlisle v. United States,* once the legal effect of their pardon was established, were entitled to file their claim against funds in the Treasury under a specific Act of Congress, the Captured and Abandoned Property Act. *See Carlisle, supra,* 83 U.S. (16 Wall.) at 151–153. The plaintiff in *Knote,* however, did not have a claim under that or any other Act, and thus the Court held he could not recover, despite his pardon.

**10.** The property had been sold, and the proceeds of the sale had been deposited in a bank in Kansas by direction of the court.

**11.** *See also Brown v. Walker,* 161 U.S. 591, 599, 16 S.Ct. 644, 647–648, 40 L.Ed. 819 (1896) (the recipient of a pardon "stands with respect to such offence as if it had never been committed");

*Armstrong v. United States,* 80 U.S. (13 Wall.) 154, 155–156, 20 L.Ed. 614 (1871) (a pardon, "granted upon conditions, blots out the offence if proof is made of compliance with the conditions; and ... the person so pardoned is entitled to the restoration of the proceeds of captured and abandoned property" if suit is timely filed); *United States v. Klein, supra* note 7, 80 U.S. (13 Wall.) at 147 (a pardon "blots out the offence pardoned and removes all its penal consequences"); *United States v. Padelford,* 76 U.S. (9 Wall.) 531, 543, 19 L.Ed. 788 (1869) (by presidential pardon, the offender "was purged of whatever offence against the laws of the United States he had committed by the acts mentioned in the findings, and relieved from any penalty which he might have incurred").

that a court would otherwise have the power to impose.

In *Burdick v. United States,* 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), the Court upheld an offender's right to refuse a presidential pardon. The pardon had been granted in an attempt to compel Burdick to testify in a case in which he had previously asserted his Fifth Amendment privilege against self-incrimination. Burdick refused, however, to accept the pardon. The Court held that he could not be forced to accept it, and that if he did not, the pardon would not become effective. In so holding, the Court balanced the President's pardoning power against the offender's Fifth Amendment privilege. "Both have sanction in the Constitution, and it should, therefore, be the anxiety of the law to preserve both—to leave to each its proper place." *Id.* at 93–94, 35 S.Ct. at 270. The Court noted that there was a "confession of guilt implied in the acceptance of a pardon," and that the offender had a right to avoid the "certain infamy" that would result from such a confession. *Id.* at 91, 35 S.Ct. at 269. In the end, the Court concluded that the harm inflicted on the President's pardoning power was less than the potential injury that the offender might suffer.[12]

Twelve years later, however, in a similar case in which the offender's privilege against self-incrimination was not at issue, the Court held that the offender could not refuse a presidential pardon commuting his sentence for murder from death to life imprisonment:

> Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent, determines what shall be done.... Supposing that Perovich did not accept the change, he could not have got himself hanged against the Executive order.

*Biddle v. Perovich,* 274 U.S. 480, 486–487, 47 S.Ct. 664, 665, 71 L.Ed. 1161 (1927). The Court expressly declined to "extend[ ]" the reasoning of *Burdick* to Perovich's case. *Id.* at 488, 47 S.Ct. at 666.

In its most recent consideration of the Pardon Clause, the Court once again described the scope of the President's pardoning authority in broad terms. "The plain purpose of the broad power conferred by [the Pardon Clause]," the Court reasoned, "was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable." *Schick v. Reed,* *supra* note 3, 419 U.S. at 266, 95 S.Ct. at 385. Thus, in ruling that the President could reduce a death sentence to life imprisonment without the possibility of parole, the Court held "that the pardoning power is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself." *Id.* at 267, 95 S.Ct. at 385.

This survey of Supreme Court case law reveals two significant features of a full and unconditional presidential pardon. First, the Court has made clear that such a pardon attaches not just to a criminal conviction, but also to the conduct which is or may be the basis of a conviction. Not only does the Pardon Clause itself speak in terms of "offences" rather than convictions,[13] but the Court's decisions have often characterized a pardon as obliterating, in the eyes of the law, the offense committed by the pardon's recipient. *See, e.g., Knote, supra* note 7, 95 U.S. at 153 ("A pardon is an act of grace by which an offender is released from the consequences of his offence"); *Carlisle, supra,* 83 U.S. (16 Wall.) at 151 (although a pardon does not alter the fact that an offense was

---

12. *Burdick* is frequently cited by critics of *Garland* as the Supreme Court's supposed retraction of the broad language employed in the *Garland* line of cases. But *Burdick* had nothing to do with the pardon's effect on the substantive consequences of a criminal conviction, nor did it even mention *Garland,* let alone discuss its holding. Thus I cannot read *Burdick* as a retreat by the Supreme Court from the principles established in *Garland* and its progeny.

13. "[T]he term 'offences' is used in the Constitution in a more comprehensive sense than are the terms 'crimes' and 'criminal prosecutions.'" *Ex parte Grossman, supra,* 267 U.S. at 117, 45 S.Ct. at 336 (citation omitted).

committed, it nevertheless "close[s] the eyes of the court to the perception of that fact").

Second, because the pardon attaches to the underlying conduct, the Court has established that a pardoned offender enjoys immunity not only from criminal prosecution, but also from any other form of punishment or civil disability imposed as a consequence of his actions. Many of the early Supreme Court cases involved attempts by the government to impose non-penal sanctions or disabilities on the pardoned offender, all of which the Court struck down. For example, in *Ex parte Garland,* the Court's decision to set aside an attorney's exclusion from practice in the federal courts was predicated on a holding that the pardon restored to him all of the rights and privileges he had enjoyed before his involvement in the Civil War. 71 U.S. (4 Wall.) at 380; *see also Boyd v. United States,* 142 U.S. 450, 453–454, 12 S.Ct. 292, 293–294, 35 L.Ed. 1077 (1892) (a full and unconditional pardon restores the testimonial competency of a convicted felon); *Knote v. United States, supra* note 7, 95 U.S. at 153 (a pardon releases the offender "from all disabilities imposed by the offence").

With these principles in mind, I turn to the specific issue presented in this case.

## II.

Whether the presidential pardon of Mr. Abrams prohibits this court from imposing any disciplinary sanction against him depends on our resolution of a somewhat narrower issue: whether the proposed sanction would constitute either a form of punishment or a civil disability stemming from his involvement in the pardoned offenses. The Supreme Court has made clear that Mr. Abrams' pardon would prevent this court from disciplining him if the sanction is either a punishment or a civil disability. I think it is both.

### A. Disciplinary Sanction As Punishment

Addressing first the punishment issue, I start with the proposition that a disciplinary proceeding against a member of the bar, although intended to protect the public and to preserve the integrity of the legal profes-sion, nevertheless has the additional effect of punishing the sanctioned attorney. *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 1225–1226, 20 L.Ed.2d 117 (1968). Thus the Supreme Court has held that disciplinary matters are "adversary proceedings of a quasi-criminal nature." *Id.* at 551, 88 S.Ct. at 1226 (citation omitted). Indeed, the Court in *Ex parte Garland* declared that "exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct." 71 U.S. (4 Wall.) at 377.

Of course, this court on many occasions has emphasized that the purpose of bar discipline is "to serve the public and professional interests ... rather than to visit punishment upon an attorney." *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc) (citations omitted); *see also In re Williams,* 513 A.2d 793, 796 (D.C.1986). Nevertheless, we have acknowledged that an unintended, yet inevitable, result of imposing a sanction on an attorney is that the attorney is penalized to some degree. *See, e.g., In re Wild,* 361 A.2d 182, 184 (D.C.1976). Accordingly, because of the harsh consequences that often result from disciplinary proceedings, we have held that attorneys are entitled to due process safeguards. *In re Thorup,* 432 A.2d 1221, 1225 (D.C.1981); *In re Wild, supra,* 361 A.2d at 184; *cf. In re Williams, supra,* 513 A.2d at 797 ("delay coupled with actual prejudice could result in a due process violation"). Given these authorities, I am convinced that the sanction imposed by the majority in this case—indeed, any sanction at all—will necessarily have a punitive impact on Mr. Abrams.

The Supreme Court's expansive reading of the Pardon Clause compels this conclusion. *See, e.g., Knote v. United States, supra* note 7, 95 U.S. at 153 ("A pardon is an act of grace by which an offender is released from the consequences of his offence"); *United States v. Klein, supra* note 7, 80 U.S. (13 Wall.) at 147 (a pardon "blots out the offence pardoned and removes all its penal consequences"). Indeed, when faced with an analogous set of facts in *Ex parte Garland,* the Court expressly held that a full presidential pardon nullified an attorney's exclusion from

the practice of law and restored him to the identical position he occupied before committing the offense:

> [W]hen the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted ... after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man....

71 U.S. (4 Wall.) at 380–381. Likewise, *Ex parte Grossman* teaches that a full presidential pardon shields its recipient even from sanctions which are left to the sole discretion of the judiciary to impose. *Grossman, supra,* 267 U.S. at 119–120, 45 S.Ct. at 336–337. Reading *Garland* and *Grossman* together, I conclude that this court cannot impose any punitive sanction on Mr. Abrams based on the conduct which was the subject of his presidential pardon.

*B. Disciplinary Sanction As a Collateral Consequence of the Pardoned Offense*

There is a separate and independent ground for rejecting the Board's recommendation. As the case law demonstrates, a full presidential pardon insulates its recipient not only from punitive sanctions based on the ·pardoned offense, but also from any civil disabilities or collateral consequences flowing from the offense. Since any suspension or censure of Mr. Abrams would have to be seen as a collateral consequence of the pardoned offense, I believe that this court is without authority to impose such a sanction.

I find support for this view in the Supreme Court's decision in *Boyd v. United States, supra.* In that case a government witness in a murder trial named Martin Byrd had previously been convicted of larceny and thus had forfeited his capacity to testify. In an effort to restore his testimonial capacity, the United States Attorney asked President Benjamin Harrison to pardon Byrd, who had already served his sentence for larceny.

President Harrison agreed and granted Byrd a full and unconditional pardon. Byrd then testified in the murder trial as the government's principal witness, and the defendants were convicted and sentenced to death. In rejecting their argument that the pardon had no restorative effect on Byrd's capacity to testify, the Court said:

> This pardon removed all objections to the competency of Martin Byrd as a witness. The recital in it that the district attorney requested the pardon in order to restore Byrd's competency as a witness in a murder trial ... did not alter the fact that the pardon was, by its terms, "full and unconditional." The disability to testify being a consequence, according to the principles of the common law, of the judgment of conviction, the pardon obliterated that effect. The competency as a witness of the person so pardoned was, therefore, completely restored.

142 U.S. at 453–454, 12 S.Ct. at 294 (citations omitted).[14] Although the testimonial incapacity of convicted felons has been generally abolished,[15] the reasoning of *Boyd* is still applicable to the case at bar. At common law, the rationale behind witness disqualification was that convicted felons were inherently untrustworthy and thus could not be relied upon to give accurate or truthful testimony. Walter M. Grant, *et al.,* Special Project, *The Collateral Consequences of a Criminal Conviction,* 23 Vand.L.Rev. 929, 1037–1038 (1970). Despite this perception, the Court in *Boyd* held that a pardon restored a felon's testimonial capacity—even though in reality the offender was no more trustworthy after receiving the pardon than before. Likewise, in this case, I do not view Mr. Abrams' pardon as mitigating his ill-advised decision to deceive Congress. I conclude only that his full and unconditional pardon protects him from any kind of official disciplinary action or any governmentally imposed civil disability.

---

14. Ironically, one of the attorneys for the petitioners in *Boyd* (the losing parties) was A.H. Garland, whose case twenty-five years earlier had established the basic principles on which *Boyd* and many other cases were decided.

15. *See, e.g.,* D.C.Code § 14–305(a) (1995); *see also* Fed.R.Evid. 601.

Further support for this conclusion is found in *Ex parte Garland,* in which the Supreme Court flatly rejected the notion that Congress had authority to place any restrictions on the effect of a presidential pardon.[16] The congressional restriction in *Garland* was a law requiring all attorneys wishing to practice in the federal courts to take a loyalty oath—regardless of whether a particular attorney had been pardoned for aiding the Confederacy. The Court held that such a restriction interfered with the virtually "unlimited" power of the President to grant pardons. 71 U.S. (4 Wall.) at 380. In so holding, the majority necessarily rejected Justice Miller's dissenting argument that Garland's pardon relieved him "from all the punishment which the law inflicted for his offence," but from "nothing more." *Id.* at 396.[17] Instead, the majority held precisely the opposite: that a pardoned offender is immune from *any* type of punitive or disciplinary measure based on the offense for which the pardon was granted. Moreover, and of special significance here, *Garland* illustrates that restrictions on an attorney's ability to practice law are among the collateral consequences which a full presidential pardon prohibits.

Finally, Mr. Abrams places considerable reliance on *Bjerkan v. United States,* 529 F.2d 125 (7th Cir.1975), for the proposition that any sanction affecting his right to practice law would be a civil disability resulting from his conviction. In *Bjerkan* an attorney had been convicted of refusing to report for induction into the military. While he was incarcerated and his habeas corpus appeal was pending, he received a full and unconditional pardon from the President. The issue before the court was whether the pardon eliminated all collateral consequences of conviction and thus mooted the appeal.

In holding that the pardon had indeed mooted the appeal, the Seventh Circuit interpreted an earlier Supreme Court decision, *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), which discussed the collateral consequences of a criminal conviction:

> The "collateral consequences" noted in *Carafas* were of a substantial nature, consisting of a deprivation of a person's basic rights, *the right to work in certain professions,* the right to vote, and the right to serve on a jury. Clearly, then, although the pardon will not render the petitioner innocent, if it restores all his basic civil rights, both state and federal, it will do away with the "collateral consequences" of his conviction.

*Bjerkan, supra,* 529 F.2d at 126–127 (emphasis added). Indeed, the Supreme Court in *Carafas,* a case not involving a pardon, specifically noted that occupational disabilities resulting from a criminal conviction were "collateral consequences" of that conviction and thus did not moot a habeas corpus proceeding even though the petitioner's prison term had expired. 391 U.S. at 237, 88 S.Ct. at 1559. Following this precedent, the court in *Bjerkan* concluded:

> [A]ny deprivation of a person's basic civil rights, including the right to vote, the right to serve on juries, and the right to work in certain professions … on account of a federal conviction would constitute a punishment. If the conviction were pardoned, as it was here, such attempted punishment would constitute a restriction on the legitimate, constitutional power of the President to pardon an offense against the United States and would be void as circumscribing and nullifying that power.

529 F.2d at 128 (citation and footnote omitted).

---

16. "This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions." *Garland, supra,* 71 U.S. (4 Wall.) at 380.

17. Justice Miller, concluding that "the oath required as a condition to practising law is not a punishment," maintained that "the pardon of the President has no effect in releasing [Garland] from the requirement to take it. If it is a qualification which Congress had a right to prescribe as necessary to an attorney, then the President cannot, by pardon or otherwise, dispense with the law requiring such qualification." *Ex parte Garland, supra,* 71 U.S. (4 Wall.) at 396–397 (dissenting opinion).

The court in *Bjerkan* also emphasized that, although a pardon "cannot erase the basic fact of conviction [or] wipe away the social stigma" that attaches to it, courts are powerless to impose any form of disciplinary sanction against a pardoned offender. *Id.* at 126–127.[18] In so ruling, the court cited *Knote v. United States, supra* note 7, and *Armstrong v. United States, supra* note 11, cases decided by the Supreme Court in the aftermath of *Ex parte Garland.* Given the long line of precedents going back to *Garland,* I think the *Bjerkan* court was entirely correct in concluding that a full presidential pardon foreclosed any civil disability that could be deemed a collateral consequence of the pardoned offense. Since any sanction imposed on Mr. Abrams in this case would be just such a consequence, the court cannot impose it.

### III.

Finally, I address the majority's and Bar Counsel's suggestion that the Supreme Court's post-Civil War pardon cases are of dubious precedential value because they have been widely criticized and rejected by other federal and state courts.

Most of the modern criticism of the *Garland* line of cases has its origin in a 1915 article by Samuel Williston in the Harvard Law Review. According to Professor Willi-

ston, the common perception is that pardoned offenders are in fact guilty, and that "when it is said that in the eye of the law they are as innocent as if they had never committed an offense, the natural rejoinder is, then the eyesight of the law is very bad." Samuel Williston, *Does a Pardon Blot Out Guilt?,* 28 HARV.L.REV. 647, 648 (1915). Williston maintained that the scope of a pardon should be viewed more narrowly than the Supreme Court had viewed it:

> The pardon removes all legal punishment for the offence. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of the crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

*Id.* at 653.[19]

Yet, despite his disapproval of the Supreme Court's earlier decisions, Williston acknowledged that in cases involving the disbarment of pardoned attorneys, "courts have found some difficulty in escaping the language of *Ex parte Garland.*" *Id.* at 655. Williston noted that courts in Kentucky,[20]

---

**18.** The *Bjerkan* court further held, in reliance on *Carlesi v. New York,* 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914), that a presidential pardon also restores a pardoned offender's civil rights under state law as well as federal law. 529 F.2d at 127–128. No state-federal issue is presented in the instant case, since this court, "the highest court of the District of Columbia," D.C.Code § 11–102 (1995), was established by Congress under Article I of the Constitution and is thus a creature of federal law. *See Lee v. District of Columbia Board of Appeals & Review,* 423 A.2d 210, 216 n. 13 (D.C.1980).

**19.** An early federal decision anticipated Williston's position. In *In re Spenser,* 22 F. Cas. 921 (Cir.Ct.D.Or.1878) (No. 13,234), the court held that a full gubernatorial pardon—which the court viewed as having the same scope as a presidential pardon—did not restore the good character of a person convicted of perjury who was applying for United States citizenship. In declining to read *Ex parte Garland* as insulating the offender from any form of punishment or

civil disability resulting from the conviction, the *Spenser* court reasoned that a pardon "does not operate retrospectively. The offender is purged of his guilt, and thenceforth he is an innocent man; but the past is not obliterated nor the fact that he had committed the crime wiped out." *Id.* at 923. Thus the court concluded that the pardoned offender had not behaved "as a man of good moral character" because "the fact remains, notwithstanding the pardon, that the applicant was guilty of the crime of perjury...." *Id.*

**20.** The Kentucky case cited in Williston's article, *Nelson v. Commonwealth,* 128 Ky. 779, 109 S.W. 337 (1908), is cited by the majority (and quoted at length in Bar Counsel's brief) for the proposition that a pardon does not interfere with a court's plenary authority to institute disciplinary sanctions against attorneys. However, the *Nelson* case, like in *In re Spenser, supra* note 19, and *In re Lavine,* 2 Cal.2d 324, 41 P.2d 161 (1935), involved an offender who had received a *gubernatorial* pardon under state law. The case at bar

Maine, and New York had all managed to disbar pardoned attorneys since the *Garland* decision, but he found none of those decisions to be particularly illuminating. *Id.* at 656. With respect to one of those cases, Williston observed:

> The New York court, though disbarring the offender, was itself guilty of the following unpardonable reasoning:
>
>> "The pardon does reach the offence for which he was convicted, and it does blot it out, so that he may not now be looked upon as guilty of it. But it cannot wipe out the act that he did, which was adjudged an offence. It was done, and will remain a fact for all time."
>
> How a man who "may not now be looked upon as guilty" of a crime, nevertheless did the act which was a crime and must now be disbarred for it, it is difficult to imagine.

*Id.* (quoting *In re Attorney,* 86 N.Y. 563, 569 (1881)). I agree with Williston's analysis of this decision. Although *Garland* and its progeny were decided during a unique period in our country's history, a time in which reconciliation was a primary political objective, that fact does not—and cannot—diminish the controlling precedential value that collectively inheres in these cases.

Nevertheless, the majority and Bar Counsel cite several federal decisions which explicitly characterize the holding in *Garland* as dictum and embrace Williston's crabbed view of the effect of a presidential pardon. Ironically, the earliest such case—and the one that has spawned additional criticism of *Garland*—is *Bjerkan v. United States, supra.* Despite the *Bjerkan* court's recognition that a full presidential pardon shielded its recipient from any substantive sanction based on the underlying conviction, the court said in a

footnote that "[a] pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex parte Garland....*" 529 F.2d at 128 n. 2. For this proposition the court curiously cited *Burdick v. United States, supra,* 236 U.S. at 91, 35 S.Ct. at 269, a case which did not overrule—or even explicitly mention—the *Garland* line of cases.[21] The court in *Bjerkan* then cited Williston's article to support its view that "the fact of *conviction* after a pardon cannot be taken into account in subsequent proceedings. However, the fact of the *commission of the crime* may be considered." 529 F.2d at 128 n. 2 (emphasis added).

Two years later, in *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122, 125 (7th Cir.1977), a case involving the three-year suspension of a pardoned attorney, the same court followed the reasoning of the *Bjerkan* footnote and declared that the attorney's pardon did not relieve him from the disciplinary sanction. "Applying *Bjerkan* here," the court said, "we hold that a presidential pardon does not relieve an attorney from discipline.... Even if plaintiff had been acquitted of the criminal charge, an Illinois disciplinary proceeding based upon his allegedly criminal conduct would not be precluded." *Id.* at 126 (citations omitted). Thus, by endorsing the Willistonian position, the court in *Grossgold* drew a distinction between criminal *conduct* and a criminal *conviction* and opined that a presidential pardon insulated the recipient from the collateral consequences of only the latter. Accordingly, the court reasoned, since a court may impose disciplinary sanctions against an attorney even in the absence of a criminal conviction, a pardon has no effect at all on such proceedings.

concerns only the *presidential* pardoning authority granted to the executive under the United States Constitution. *See Biddle v. Perovich, supra,* 274 U.S. at 480, 486, 47 S.Ct. at 664, 665 (a presidential pardon "is not a private act of grace from an individual happening to possess power" but rather "is a part of the Constitutional scheme"). Decisions analyzing the scope of a governor's pardoning authority, including several of the cases cited by the majority, have no bearing at all on the soundness of the *Garland* line of cases, which focus instead on what is at issue in this case: the pardoning authority *of the*

*President of the United States.* Since that authority is derived from the Constitution of the United States, this court must look to the pronouncements of the Supreme Court as definitive, and must ignore cases from other federal and state courts to the extent that they contradict what the Supreme Court has said. *See Allison v. United States,* 623 A.2d 590, 592 (D.C.1993) ("we must defer to the Supreme Court because it is the ultimate authority in interpreting ... any ... part of the Constitution").

**21.** See note 12, *supra.*

More recently, the Third Circuit has ruled that a full and unconditional presidential pardon does not entitle its recipient to have a criminal conviction expunged from his record. *United States v. Noonan,* 906 F.2d 952 (3d Cir.1990). In reaching this conclusion, the court cited *Burdick v. United States, supra,* as indicating the Supreme Court's retreat from the position it took in *Garland* that a pardon blots out the existence of guilt. *Id.* at 958. The court also quoted favorably from the *Bjerkan* footnote and from various English cases expressing a considerably narrower view of the pardoning power than that expressed in *Garland* and its progeny. *Id.* at 959–960.

These decisions from the Third and Seventh Circuits are plainly irreconcilable with the Supreme Court's consistent and explicit pronouncements on the scope of a presidential pardon. Even assuming that the Court's pardon discussion in the *Garland* case itself is dictum, as cases like *Noonan* suggest (but see note 8, *supra* ), the Court has reiterated its expansive reading of the Pardon Clause in many subsequent decisions by which we are bound. *See, e.g., Ex parte Grossman, supra,* 267 U.S. at 117, 45 S.Ct. at 335–336; *Knote v. United States, supra* note 7, 95 U.S. at 153; *Carlisle v. United States, supra,* 83 U.S. (16 Wall.) at 151. This court simply cannot ignore or avoid the collective force of these decisions.

Finally, the majority cites a case from the District of Columbia Circuit, *In re North (George Fee Application),* 314 U.S.App. D.C. 102, 62 F.3d 1434 (1994). There is some language in the *North* opinion that is consistent with the majority's position, but the actual holding of *North* is much narrower. The petitioner in that case, Mr. George, was a subject of the same investigation by the Independent Counsel that involved Mr. Abrams. George was indicted for several offenses and, after a jury trial, was found guilty on two counts of the indictment. Before he could be sentenced, however, he was pardoned by President Bush as one of the group in which Mr. Abrams was also included. He then sought reimbursement of his legal fees under 28 U.S.C. § 593(f) (1988). The court denied his request on the ground

that it could not "pay money from the Treasury without an act of Congress authorizing the payment," *id.* at 104, 62 F.3d at 1436, and that the presidential pardon did not empower the court to act. "[T]he constitutional requirement that funds from the Treasury may be disbursed only by authorization of Congress is a restriction on the President's power to pardon." *Id.* at 106, 62 F.3d at 1438. This holding is entirely consistent with *Knote v. United States, supra* note 7, and in fact the court expressly relied on *Knote* in its opinion. Although the court did discuss the *Garland* case, its actual decision was based not on *Garland* (or a rejection of *Garland* ) but on the same restriction on the presidential pardoning power first recognized in *Knote.* Thus *North* is of no assistance to either side in this case.

Bar Counsel's arguments and, ultimately, the majority opinion are based on the faulty premise that lower federal court decisions decided in the latter half of this century somehow outweigh a series of Supreme Court decisions issued in an earlier period. I know of no authority supporting the view that, simply because a Supreme Court opinion is old, it may no longer be viewed as binding precedent; on the contrary, it is binding until the Supreme Court says otherwise, or (in some cases) until Congress changes the applicable law. I fear that the majority has allowed itself to be led astray by the assertions of Bar Counsel and the wishful thinking of Professor Williston.

### IV.

Nothing in this opinion should be construed as condoning Mr. Abrams' admitted violations of federal law. "A lawyer is held to a high standard of honesty, no matter what role the lawyer is filling: acting as lawyer, *testifying as a witness in a proceeding,* handling fiduciary responsibilities, or conducting the private affairs of everyday life." *In re Jackson,* 650 A.2d 675, 677 (D.C. 1994) (emphasis added). Lying to Congress is reprehensible under any circumstances, and, but for the pardon, Mr. Abrams' conviction based on that conduct might well war-

rant a sanction of some kind.[22] However, the "act of grace" which President Bush has seen fit to bestow upon him has tied this court's hands and left it powerless to act. The court therefore has no choice but to reject the Board's recommendation and impose no sanction whatsoever. Because a majority of my colleagues holds otherwise, I respectfully dissent.

---

**22.** Since I conclude that this court is barred by the pardon from imposing any sanction at all, I do not consider what sanction might be appropriate if the court had the power to impose one.